575 S.E.2d 393

STATE of West Virginia ex rel. K.M., a Minor Child, by Her Mother and Next Friend, Katrina M., et al., Individually and as Class Representatives of Similarly Situated Persons, Petitioners,

v.

WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN RESOURCES and Paul Nusbaum, Secretary, Respondents.

No. 30494.

Supreme Court of Appeals of West Virginia.

Submitted Nov. 6, 2002.

Decided Dec. 9, 2002.

Concurring Opinion of Justice Starcher Jan. 6, 2003.

Larry L. Harless, Esq., Cottageville, Daniel F. Hedges, Esq., Mountain State Justice, Charleston, for Petitioners.

Darrell V. McGraw, Jr., Attorney General, Katherine A. Campbell, Assistant Attorney General, Charleston, for Respondents.

McGRAW, Justice.

This case is before this Court upon an original petition for a writ of mandamus filed by the petitioners, K. M., a minor child, by her mother and next friend, Katrina M., et al., on March 19, 2002. The respondents are the West Virginia Department of Health and Human Resources and its Secretary, Paul Nusbaum. The petitioners are recipients of monthly checks pursuant to a federally funded program, administered by the respondent DHHR, known as Temporary Assistance for Needy Families (or "TANF"). 42 U.S.C. 601 [1996], et seq. Under the program, the petitioners became eligible to receive assistance checks for a limited period of 60 months, subject to a maximum, State determined, extension of six months. Presently, the petitioners' monthly checks have, or shortly will be, terminated pursuant to the 60–month rule, and the petitioners, generally, have been unable to obtain extensions for various reasons. In seeking relief in mandamus, the petitioners challenge the constitutional validity of the cut-off of their assistance and allege several defects in the respondent's [1] operation of the TANF program.

1. The petitioners brought suit against The West Virginia Department of Health and Human Re-

## I.

### BACKGROUND

On April 17, 2002, this Court entered an order directing the respondents to show cause why relief in mandamus should not be awarded. Soon after, on May 2, 2002, this Court entered an order appointing the Honorable Daniel L. McCarthy, Senior Status Judge, as a Special Commissioner in this case.[2] Before relating the findings of the Commissioner, we briefly review the background of the instant matter.[3]

### A. The Federal and State Statutory Scheme

This case concerns what are commonly referred to as "welfare" benefits. While "welfare" can mean many things, the term most commonly applies to cash assistance from the government in the form of a monthly check. Through 1996, the federal and state government provided this assistance through the Aid to Families with Dependent Children (AFDC) program. In 1996, Congress passed the Personal Responsibility and Work Opportunity Reconciliation Act and, in conjunction therewith, created the Temporary Assistance to Needy Families (TANF) program. 42 U.S.C. 601 [1996], *et seq.*

The new statutes represented a general shift in policy, from one of indefinite eligibility for cash assistance, to a system whereby assistance is paid to recipients for a limited period of time in hopes of promoting self-sufficiency. Thus, Congress specified that assistance under TANF was not an "entitlement" and that assistance would terminate after 60 months (subject to certain extensions as determined by the respective States). 42 U.S.C. 601(b); 42 U.S.C. 608(a)(7).

The TANF program is federally funded by way of block grants provided to the States. With regard to West Virginia, the federal government provides an annual block grant, which in recent years has been approximately $110 million (to be used in conjunction with about $34 million in State funds). The States, however, have a considerable amount of discretion to determine the eligibility criteria for assistance payments and to provide for hardship extensions with regard to the 60–month termination rule. One certain requirement in the federal statute is that the number of extensions or exceptions to the 60–month rule may not exceed 20 percent of the average monthly number of families to which assistance is provided by TANF funds. 42 U.S.C. 608(a)(7).

In West Virginia, the Office of Family Support of the respondent West Virginia Department of Health and Human Resources administers the TANF program. Specifically, the West Virginia counterpart to TANF is known as the WV WORKS Act. W. Va.Code, 9–9–1 [1996], *et seq.* Currently, the respondents administer an assistance case load in excess of 14,000 families. In order to receive cash assistance, West Virginia recipients must sign a Personal Responsibility Contract, setting forth their obligations under the program. W. Va.Code, 9–9–9 [2000]. The Personal Responsibility Contract makes note of the 60–month rule and sets forth goals specific to the recipient, such as obtaining further education, child care and/or job training.

Like its federal counterpart, the West Virginia statute places limits on the duration of cash assistance. However, the Legislature has granted broad authority to the Secretary

sources and its secretary, Paul Nusbaum. As the Department and the Secretary are, for purpose of this opinion, one in the same, we refer to respondent in the singular. We also use the terms "DHHR" and "Secretary" at times in lieu of "respondent."

2. At the outset we wish to recognize the excellent work performed by the Special Commissioner and his clerk on this difficult and involved litigation.

3. We also note that a number of *amicus curiae* briefs have been received in this case. They include briefs from: (1) Darrell V. McGraw, Jr., Attorney General, and Scott E. Johnson, Senior Assistant Attorney General, (2) the Coalition for West Virginia's Children, (3) the State Labor Federation, AFL–CIO, and United Mine Workers of America, (4) the Southern Appalachian Labor School, (5) William Weiss, Joseph J. Simoni and Rosemary Anderson, and (6) the Direct Action Welfare Group. We are grateful for the insights provided by the *amici,* and mindful of the effort and legal scholarship the briefs represent.

of the Department of Health and Human Resources to make exceptions:

> The length of time a participant may receive cash assistance through the West Virginia works program shall be defined in the personal responsibility contract: Provided, That no participant may receive benefits for a period longer than sixty months, *except in circumstances as defined by the secretary.*

W. Va.Code § 9–9–10 (1997) (emphasis added). Attendant to the statutory WV WORKS Act is the respondent DHHR's WV Income Maintenance Manual. Section 15.6 of the Manual is entitled "Lifetime Limit for Receipt of Cash Assistance" and provides for an extension of the 60–month limit for up to six months. Specifically, section 15.6 C. sets forth nine grounds upon which a recipient may request an extension of monthly assistance. The nine grounds include: (1) domestic battery, (2) providing care for a relative, (3) inappropriate case management by the DHHR, (4) disability, (5) pregnancy, (6) participation in vocational or educational training, (7) lack of child care, (8) a high county unemployment rate and (9) the recipient is "unemployable." Thus, a limited hardship extension of up to six months, for the above reasons, represents the current "circumstances as defined by the Secretary" for exceeding the five-year time limit. The manual provides for an "Extension Committee" that will review applications for extensions. The manual also provides for a "Fair Hearing Examiner" who has very limited authority to review the decisions of the committee, which we discuss at length below.[4]

According to the respondent DHHR, TANF recipients are mailed notices in the 48th, 54th and 55th month to the effect that their assistance will terminate at the end of 60 months. At approximately the 55th month, the recipient, or his or her caseworker, may apply to the DHHR's Office of Family Support Extension Committee for an extension of assistance payments. If the Extension Committee denies an extension, the recipient may request a reconsideration by the Committee. In addition, the recipient may request a hearing before the Fair Hearing Examiner.

With regard to the Fair Hearing Examiner, section 15.6 D. of the Manual states: "The decision of the OFS[5] Extension Committee to approve or deny an extension is final and cannot be overturned by a Fair Hearing decision, except when the decision was based on inaccurate information." Thus the rules and regulations established by the Secretary appear to give little or no authority to the Fair Hearing Examiner to reverse the Committee, and appear to provide no option to extend any TANF recipient beyond five years and six months, in any circumstance.

### B. Procedural Background and Hearings Before the Special Commissioner

■ As stated above, petitioners, K. M., a minor child, by her mother and next friend, Katerina M., *et al.,* filed an original petition for a writ of mandamus in this Court on March 19, 2002. Thereafter, this Court entered a show cause order and appointed the Honorable Daniel L. McCarthy, Senior Status Judge, as a Special Commissioner in the case. In April and in June 2002, respondents DHHR and Secretary Nusbaum filed responses denying that the petitioners were entitled to relief. Motions filed by the petitioners (designed to preclude the termination of their monthly checks) for a stay, an amended stay and for default judgment were denied by this Court.[6]

---

4. It appears that in many cases the period of time it takes to get approved for an extension may exceed the time period of the extension itself.

5. Office of Family Services, a division of the Department of Health and Human Resources.

6. We realize that most, if not all, of the petitioners already have seen their payments cease due to the passage of time. However, this issue is not moot because the petitioners are challenging the legality of the system that resulted in the cessation of their benefits. Furthermore, many other similarly situated people face the termination of their benefits in the future. As we have often held:

> A case is not rendered moot even though a party to the litigation has had a change in status such that he no longer has a legally cognizable interest in the litigation or the issues have lost their adversarial vitality, if such

The petitioners describe themselves as families made up of one or more children and one or both parents (or other adult caretaker) living in the same home. We are well aware that as many as two/thirds of the individuals receiving aid under the TANF program are children, and that our decision today has a substantial impact on their future. As stated by the petitioners, the average family, consisting of two children and their mother, receives approximately $450 per month in assistance ($150 per person per month).[7] The petitioners allege that they constitute a class of similarly situated persons who were notified by the respondent Department of Health and Human Resources that their monthly assistance checks would be terminated. As alleged by the petitioners, at the time the Special Commissioner considered this case, 556 families had already been so notified. We are uncertain how many additional families have reached the five-year cut off at this time.

One of the named petitioners, K.M., is an eight-year-old child living in McDowell County with her mother, petitioner Katrina M. According to the petition, Katrina M.'s family was one of the families in West Virginia to which notice was sent stating that their assistance under the TANF and WV WORKS programs was about to terminate. While the parties have supplied this Court with a wealth of information about the program and its participants, we are still uncertain as to how many individuals have had their cash assistance cut off to date. We would imagine that quite a large number of individuals or families would have lost their cash assistance immediately after the five-year anniversary of the program change, which would have

occurred on January 1, 2002, for many. It appears logical to presume that a majority of those with persistent obstacles to self-sufficiency would have been receiving cash assistance continually throughout the first five years of the new program. Thus it also appears logical to presume that the greatest percentage of such "hardship" cases were all terminated, with respect to cash assistance payments under TANF, in the early months of 2002.

For the specific petitioners in this case, the terminations were generally scheduled to begin in January 2002. The termination notice, i.e., the 55th month notice described above, stated in part:

Your WV Works check is going to stop.... Our records show that you have received a check from DHHR for a total of 55 months.... Stopping your check will not automatically stop your Food Stamps.... If you receive Medicaid, your medical card will not be affected [.] ... There is a small number of families in extreme hardship situations who may temporarily continue to receive a check after receiving benefits for 60 months.... [Y]ou may be considered for a temporary extension of the 60 month time limit.... Only one temporary extension is allowed for each family, and the extension may be for 1–6 months.

Attached to the 55th month termination notice was a form for the requesting of an extension of the 60–month time limit, along with information about the extension procedure and the nine grounds specified in the DHHR's WV Income Maintenance Manual upon which requests for an extension may be based.

issues are capable of repetition and yet will evade review.
Syl. pt, 1, *State ex rel. M.C.H. v. Kinder*, 173 W.Va. 387, 317 S.E.2d 150 (1984) (emphasis added.). We have also often described our test for determining whether to address a moot issue:
Three factors to be considered in deciding whether to address technically moot issues are as follows: first, the court will determine whether sufficient collateral consequences will result from determination of the questions presented so as to justify relief; second, while technically moot in the immediate context, questions of great public interest may nevertheless be addressed for the future guidance of

the bar and of the public; and third, issues which may be repeatedly presented to the trial court, yet escape review at the appellate level because of their fleeting and determinate nature, may appropriately be decided.
Syl. pt 1, *Israel by Israel v. W. Va. Secondary Schools Activities Comm'n*, 182 W.Va. 454, 388 S.E.2d 480 (1989).

7. The amicus briefs suggest that this figure still leaves the recipients well below the federal poverty level, even if one considers any other aid, such as rental assistance or food stamps, that the families might also receive.

As stated above, the petitioners sought relief in mandamus in this Court, challenging the constitutional validity of the cut-off of their assistance, both substantively and procedurally. This Court referred the case to the Special Commissioner, who conducted evidentiary hearings upon the petitioners' motion on June 11, 14 and 24, 2002.[8] So that we might put a human face on the affected parties, we briefly review the Special Commissioner's findings of fact.

1. Recipient Sophia D.,[9] age 27, is a single parent living with her 5 year old daughter in publicly subsidized housing in Mingo County. Ms. D. signed a number of DHHR documents including: (1) a Personal Responsibility Contract, (2) a Self–Sufficiency Plan, (3) a WV Works Orientation notice and (4) a number of Rights and Responsibilities agreements. Among other things, those documents informed Ms. D. of the 60 month assistance limit. Ms. D.'s assistance checks in the amount of $401 per month terminated in April 2002. During the period in question, Sophia D. suffered from a number of health problems including chronic trouble with her spine, a crushing injury to her ankle and clinical depression. In that regard, Ms. D. was found to be incapacitated by a State medical review team. She applied for S.S.I. benefits. Ms. D. has trouble paying her utility bills and is fearful that, as a result, she will have to move from her subsidized housing. Nevertheless, she was orally informed that her request for an extension of her monthly assistance, based upon disability, was denied by the Extension Committee. The termination of her assistance did not affect her entitlement to food stamps or to Medicaid benefits. Moreover, Ms. D.

remained eligible for transportation and clothing vouchers.

2. Recipient Monica L., age 25, lives with her three children in McDowell County. As a result of flood damage to her home, Ms. L. and her children were resettled in temporary housing provided by the federal government. Ms. L. signed a number of DHHR documents including: (1) a Personal Responsibility Contract, (2) a Self–Sufficiency Plan, (3) a WV Works Orientation notice and (4) a number of Rights and Responsibilities agreements. Among other things, those documents informed Ms. L. of the 60 month assistance limit. Ms. L.'s assistance checks in the amount of $512 per month terminated in February 2002. There was no extension. During the period in question, Ms. L.'s primary problems concerned lack of child care and lack of transportation. She obtained midnight-shift employment but left that job because she was unable to secure someone to watch her children. She received help from her parents, but health problems precluded their continued involvement. Ms. L. indicated that the Fair Hearing Process was never explained to her. The termination of Ms. L.'s assistance did not affect her entitlement to food stamps or to Medicaid benefits.

3. Recipient Carlotta W., age 40, lives with her husband and three children in Mercer County. Her husband is disabled and receives S.S.I. benefits in the amount of $545 per month. Ms. W. signed a number of DHHR documents including: (1) a Personal Responsibility Contract, (2) a Self–Sufficiency Plan, (3) a WV Works Orientation notice and (4) a number of Rights and Responsibilities agreements. Among

8. The witnesses called by the petitioners included: (1) Richard A. Wilson, Director of the American Friends Service Committee of the West Virginia Economic Justice Project, (2) Dr. John David, Professor of Economics and Labor Relations at the West Virginia Institute of Technology, (3) assistance recipients Sophia D., Monica L. and Carlotta W., (4) Jonalee Young of the DHHR's Office of Family Support, (5) John Law, Director of the DHHR's Office of Communications and Legislative Affairs, and (6) Frederick Dale Boothe, Commissioner of the DHHR's Bureau of Children and Families. The witnesses called by the respondents included: (1) Family

Support Specialists (caseworkers) Nadene Masri, Linda Moore, Mary Baldwin, Patricia Beverly and Rhodeena Hatfield, (2) Doug Robinson, Chief Financial Officer of the DHHR's Bureau of Children and Families, and (3) Karen O'Sullivan Thornton, Director of the DHHR's Office of Family Support.

9. Because of the potentially sensitive facts of this case, we use only the last initial of the petitioners. *See State v. George W.H.*, 190 W.Va. 558, 562 n. 1, 439 S.E.2d 423, 427 n. 1 (1993).

other things, those documents informed Ms. W. of the 60 month assistance limit. Ms. W.'s assistance checks in the amount of $512 per month terminated in January 2002. During the period in question, Ms. W. suffered from a number of health problems including depression and trouble with her back and legs. Nevertheless, her request for an extension (based upon disability) was denied by the Extension Committee. As the Committee stated: "Although you and your husband have been determined disabled, you have been repeatedly denied social security benefits, S.S.I., and it appears unlikely you will be approved within [the] requested extension period." Ms. W. appealed the denial of an extension, and a hearing was conducted on February 20, 2002, at which Ms. W. testified. The Fair Hearing Examiner upheld the decision of the Extension Committee. In so ruling, the Examiner stated that "the information submitted to the Committee was accurate." The termination of Ms. W.'s assistance did not affect her entitlement to food stamps or to Medicaid benefits. Moreover, the family remained eligible for a school clothing allowance.

Final Recommendations of the Special Commissioner.

After conducting these hearings, the Special Commissioner issued an order entitled "Final Recommendations of the Special Commissioner," released by this Court on August 21, 2002. In this document, the Special Commissioner found that no "constitutional right to welfare" exists in West Virginia, and that the petitioners did not have a property interest in their cash assistance payments. However he also found that, "although there may be no property interest in the assistance payments *per se*, the petitioners have established that recipients have a vested or property interest in the adequacy and fairness of the extension process."

Ultimately he found fault with the procedure for conducting a hearing after an applicant was denied an extension (which we discuss in greater detail, *infra*), and recommended that this Court order a modification of the hearing process to give the Fair Hearing Examiner the authority to reverse or remand the Extension Committee and authority to grant an extension, in appropriate cases, up to the applicable limit. The Special Commissioner also recommended significant changes to the hearing process,[10] and specifically suggested that DHHR "develop methods or procedures, with appropriate notice to recipients, to ensure the confidentiality of processing requests for extensions upon the ground of domestic violence." He also suggested that DHHR "renotify all recipients, including the petitioners, who have been denied an extension by the Extension Committee" to inform them of the new authority of the Fair Hearing Examiner. Finally the Special Commissioner noted:

Given the limited number of recipients to be so renotified, the financial impact upon the State of these recommendations should be minimal. In any event, while the problem of additional expense must be kept in mind, such expense would not justify failing to modify the Fair Hearing process to conform with fundamental rules of law. *Kelly v. Wyman*, 294 F.Supp. 893, 901 (S.D.N.Y.1968), *affirmed* in *Goldberg, supra*.

Final Recommendations of the Special Commissioner.

## II.

### STANDARD OF REVIEW

■■■ Our standard of review for original proceedings in mandamus is long established:

A writ of mandamus will not issue unless three elements coexist: (1) a clear legal

---

**10.** The Special Commissioner specifically suggested that:

(1) that the recipient shall have the right to appear before the Fair Hearing Examiner and present evidence and cross-examine adverse witnesses, (2) that the recipient shall have the right to appear before the Fair Hearing Examiner with or without counsel or other representative and (3) that, following the evidentiary hearing, the Fair Hearing Examiner shall provide the recipient with a written decision containing findings of fact, conclusions of law and notice concerning the procedures for circuit court review.

Final Recommendations of the Special Commissioner.

right in the petitioner to the relief sought, (2) a legal duty on the part of respondent to do the thing which the petitioner seeks to compel and (3) the absence of another adequate remedy.

Syl. pt. 1, *State ex rel. McLaughlin v. The West Virginia Court of Claims*, 209 W.Va. 412, 549 S.E.2d 286 (2001); *accord*, syl. pt. 2, *State ex rel. Kucera v. City of Wheeling*, 153 W.Va. 538, 170 S.E.2d 367 (1969). We also note that with respect to agency regulations, "The judiciary is the final authority on issues of statutory construction, and we are obliged to reject administrative constructions that are contrary to the clear language of a statute." Syl. pt. 5, *CNG Transmission Corp. v. Craig*, 211 W.Va. 170, 564 S.E.2d 167 (2002).

## III.

## DISCUSSION

Petitioners make several arguments, primary among them that the termination of the TANF cash assistance payments without a pre-termination hearing amounts to a denial of due process, and that certain provisions in our Constitution establish a State constitutional right to subsistence. Petitioners also assert several instances where the Secretary has failed, in their view, to administer to the program properly. We deal with each argument in turn.

### A. Constitutional Concerns

#### 1. *No Constitutional Right to Pre–Termination Hearing*

■ Petitioners first argue that the State must conduct a "pre-termination" hearing before terminating any recipient's cash assistance. Petitioners base this argument on the United States Supreme Court case of *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), and argue that, under *Goldberg*, cash assistance cannot be terminated prior to a due process hearing

that would include adequate notice, the right to present evidence and cross-examine witnesses, the right to counsel, and a post-hearing written statement resolving both the factual and legal issues. We are not persuaded by this argument.

As respondents acknowledge, Congress made sweeping changes to this area of the law with the passage of the 1996 Act, chief among them the specific pronouncement that "No individual entitlement: This part shall not be interpreted to entitle any individual or family to assistance under any State program funded under this part." 42 U.S.C. § 601(b). Similarly, our own Legislature provides that "(1) The entitlement of any person to receive federal-state cash assistance is hereby discontinued" W. Va.Code § 9–9–2 (2001). While reasonable minds may differ as to the wisdom of this approach, clearly the Congress and the Legislature intended a clear break with the past practice of providing cash assistance of unlimited duration to the poor.[11]

Moreover, petitioners' primary authority on this issue is inapposite, as *Goldberg* was written before the 1996 Act and concerned rights under the old benefit scheme. Therefore, in light of the specific dictates of the Congress and the Legislature, we must reject petitioners' argument that a pre-termination hearing is required before ending TANF cash assistance due to the expiration of the five-year time limit.

#### 2. *Constitutional Treatment of West Virginia's Poor*

Petitioners' next argument is that certain provisions in our Constitution provide a right to subsistence payments. They claim that, because of this right, the State cannot cut off their cash assistance payments under TANF. Thus the petitioners' argument in this vein is twofold: that such a constitutional right exists, and that by cutting off cash assistance

**11.** We understand the apparent theory behind the change in policy is that a lack of cash might motivate some who receive assistance to take greater action to improve their circumstances, and that this might not be as likely to happen as long as the checks continue to come. We doubt that the average award of $450 per month would encourage any reasonable person to simply stay home and wait for the mail. Even if the family also receives food stamps, rental assistance, and clothing vouchers, we imagine that even the most parsimonious mother of two would expend more than $15 per day on the other expenses of life. However, as we discuss below, we believe that it is for the Legislature, and not this Court, to determine the best means of assisting our poor, as long as assistance is provided.

after five years, the State is violating this right.

■ In support of the first part of this argument, petitioners suggest that the existence of the office of "Overseer of the Poor" in the Constitution proves their point. That section reads:

> 2. **Constables, Coroners and Overseers of the Poor**
>
> There shall also be elected in each district of the county, by the voters thereof, one constable, and if the population of any district shall exceed twelve hundred, an additional constable, whose term of office shall be four years, and whose powers as such shall extend throughout their county. The assessor shall, with the advice and consent of the county court, have the power to appoint one or more assistants. Coroners, *overseers of the poor* and surveyors of roads, *shall be appointed by the county court.* The foregoing officers, except the prosecuting attorneys, shall reside in the county and district for which they shall be respectively elected.

West Virginia Constitution, Art. IX, § 2 (emphasis added.) Petitioners' basic argument is that this provision was placed in the Constitution for a reason, and that accepting respondent's argument (that no right to subsistence exists) would render this provision meaningless, in that these officers named in the Constitution obviously must have some duty to perform. We note briefly that, "[i]t is always presumed that the legislature will not enact a meaningless or useless statute," Syl. pt. 4, *State ex rel. Hardesty v. Aracoma,* 147 W.Va. 645, 129 S.E.2d 921 (1963), and that the same might be said for the Constitution.

Research indicates that many other states make some specific mention of the poor in their Constitutions, including New York, Alabama, Mississippi, South Carolina, Texas,

and Wyoming.[12] We have noted before that a review of the Constitutions of other jurisdictions can provide a rich source of interpretive guidance. *See, Phillip Leon M. v. Bd. of Educ.* 199 W.Va. 400, 404, 484 S.E.2d 909, 913 (1996) (finding education to be a fundamental constitutional right in West Virginia).

■ Petitioners provide us with an informative review of constitutional and statutory provisions for dealing with the poor dating from our own Constitution back through that of colonial Virginia and even pre-colonial measures existing in English law.[13] We agree with the petitioners that: " 'The fundamental principle in constitutional construction is that effect must be given to the intent of the framers of such organic law and of the people who ratified and adopted it.' *State ex rel. Brotherton v. Blankenship,* 157 W.Va. 100, 108, 207 S.E.2d 421, 427 (1973)." Syl. pt. 3, *State ex rel. Rist v. Underwood,* 206 W.Va. 258, 524 S.E.2d 179 (1999).

We note that the text of this provision does not so much declare the existence of overseers of the poor or describe their duties, as it seems to presume that such an office exists, and that each county would naturally have such officers, just as it would have a coroner or a road surveyor. In support of the argument that the founders of the State took for granted the notion that the State should care for the poor, petitioners point us to the case of *Wells v. Town of Mason,* 23 W.Va. 456 (1884), in which this Court faced the question of who should pay for the medical care of a pauper. The treating doctor had sued the town and received a judgment, but the town refused to pay on the basis that the county had the duty to pay.

> As I understand the law, the duty of furnishing the necessary aid and assistance to a pauper living in the town of Mason was imposed on the overseers of the poor of Mason county, and the support of such pauper is a charge on the county of Mason

---

12. Ala. Const. art. IV, § 88, Haw. Const. art. IX, § 3; Idaho Const. art. X, § 1; Ind. Const. art. IX, § 3; Kan. Const. art. 7, § 4; Miss. Const. art. 4, § 86, art. 14, § 262; Mont. Const. art. XII, § 3(3); Nev. Const. art. 13, § 1; N.Y. Const. art. XVII, § 1; N.C. Const. art. XI, § 4; Ok. Const. art. 17, § 3; S.C. Const. art. XII, § 1; Tex. Const. art. 11, § 2; Wyo Const. art. 7, § 18;

13. We especially appreciate petitioners argument (echoed by some *amici*) that the philosophy of John Locke and his influence on both English law and early American law may provide the ultimate source for the idea that the government bears some responsibility for the care of its poor. We regret that time does not allow a more thorough discussion of this argument.

and not on the town of Mason. All paupers in this State are under our statute-law, as I understand it, to be supported by the several counties and not by the town, in which they reside....

*Wells*, at 462 (citations omitted).[14] It is clear that the issue before the Court was not *whether* some governmental entity was responsible for paying the pauper's doctor bill, but *which* entity should pay.

Respondent directs us to a case from the 1940's that concerned the transfer of county funds to the State as a contribution toward the State's relief efforts for the poor, in which the court stated in dicta: "There is nothing in our Constitution which imposes any duty on the county court [now county commission] with respect to the care of the poor." *Kenny v. County Court of Webster County*, 124 W.Va. 519, 524, 21 S.E.2d 385, 387 (1942). The Court considered whether Webster County had to transfer certain funds to the State to reimburse the State for "relief funds" the State expended in Webster County. We believe that the main thrust of the opinion in this case was that the State, and not the county, had the ultimate responsibility to care for the poor. The only syllabus point issued by the Court concerning the Constitution simply stated that a statute amending the "General Welfare Law of 1936 is constitutional." *Id.* at syl. pt. 1, 21 S.E.2d 385. While the Court made the above statement and did quote outside authority to the effect that there is "no legal obligation at common law ... to furnish relief to paupers," we do not believe these statements were central to the case. To the extent that *Ken-*

*ny* conflicts with our ruling in this case, it is hereby distinguished.[15]

We also attach some significance to the fact that the code in effect between the State's formation and the ratification of the 1872 Constitution stated that the "overseers of the poor ... shall assist any person who is unable to maintain himself or his family as his or their necessities may require." W. Va.Code, Chapter 46 (1870), p. 318. We also note that this statute remained essentially unchanged when the Legislature recodified it after the 1872 Constitution. See, *The Code of West Virginia*, Chapter 80, p. 319 (1873).

What this suggests to us is that the framers of our State Constitution were aware both in 1863 and 1872 of the longstanding existence of overseers of the poor in both pre- and post-revolutionary Virginia. Just as we are aware today of their traditions, the State constitutional framers were aware of the long history of State care for the poor from as long ago as seventeenth-century England and up to the formation of West Virginia. It is reasonable to presume that our State's founders simply continued the longstanding Virginia policy and practice of employing overseers of the poor to provide subsistence for the needy.

It cannot escape our notice that many of the drafters of our Constitution and many of our State's early leaders were deeply religious men who came from and lived in a less secular culture shaped by traditional Christian principles of charity and concern for the poor.[16] We have stated previously that the

---

**14.** Although the opinion employs the first person singular, the opinion is a majority opinion of this Court.

**15.** Respondent suggest that our Constitution does not bear on this issue, and even petitioners admitted during argument that federal courts have found no such obligation in the U.S. Constitution. However, it is clear that our Constitution may offer greater protections than its federal counterpart. *See,* syl. pt. 1, *Women's Health Center v. Panepinto*, 191 W.Va. 436, 446 S.E.2d 658 (1993), and syl. pt. 1, *State v. Bonham*, 173 W.Va. 416, 317 S.E.2d 501 (1984), stating that, in certain instances, the Constitution of West Virginia may require higher standards of protection than afforded by the Constitution of the United States.

**16.** We know, for example, that many of those attending the Constitutional Convention were ministers:

There were eight ordained ministers at the 1861 Convention, and several other delegates were well-known "exhorters," or lay preachers; and many other delegates were followers of the minister delegates. Their role at the Convention was very important. For the most part Methodist circuit riders and sympathetic to abolitionism, they had preached the gospel of the Union throughout northwestern Virginia for a decade.

Thomas Whitney Rodd, *Tracing West Virginia's Constitution* p. 29. We know that their view of the world had significant impact on the Constitution. As is the case with most religions, Christianity places *an emphasis on care for the less*

history known to or experienced by the framers of the Constitution must play some role in our interpretation of their words. As we stated after a discussion of the history of the 1872 Constitution in another case:

> The upshot of this discussion is that the men who drafted the 1872 Constitution, and who reinserted the Emoluments Clause as contained in previous Virginia constitutions, came from this background and lived in these times; the events of those days were fresh in their memories when they forged our present Constitution.

*State ex rel. Rist v. Underwood,* 206 W.Va. 258, 268, 524 S.E.2d 179, 189 (1999).

For approximately the first 50 years of our State's existence, the overseers continued to provide subsistence aid to the poor until the days of the Great Depression when overwhelming numbers of needy caused the state and federal governments to play larger roles in caring for the poor. However, the move to greater federal or State responsibility merely shifted the administrative and fiscal focus from the counties to the State or nation as a whole, but the operative principle that the public should not ignore or abandon the least fortunate remains intact today.

The 1930's and the "New Deal" of President Franklin D. Roosevelt brought sweeping changes to the "welfare" practices of the States and created many new programs such as the Works Project Administration and the Civilian Conservation Corps. The focus of the nation, and the State, was to help those in poverty so that poverty did not undermine our society. The measure of success at that time was not necessarily determined by the number of people who could be declared "off welfare:"

> The test of our progress is not whether we add more to the abundance of those who have much; it is whether we provide enough for those who have too little.

Franklin D. Roosevelt, Second Inaugural Address, Wednesday, January 20, 1937. Although this notion seems increasingly out of vogue in our current climate, we nonetheless

bear it in mind in our consideration of this case.

Of course, today it is the Code, not the Constitution, that specifically describes how it is that the poor shall receive assistance. While this Court may determine that the Constitution requires certain actions, this Court does not have the power to provide funds or execute those actions. This obvious distinction was also observed by the framers of the United States Constitution, as we noted in a case concerning the budget for the judicial branch of government:

> In the early years of our democracy the people learned that the legislative branch of the government had strength and power in its control of revenues and appropriations. Hamilton noted this in The Federalist No. 78 when he wrote:
>
> ". . . The Executive not only dispenses the honors, but holds the sword of the community. The Legislature not only commands the purse, but prescribes the rules by which the duties and rights of every citizen are to be regulated. The Judiciary, on the contrary, has no influence over either the sword or the purse. . . ."

*State ex rel. Bagley v. Blankenship,* 161 W.Va. 630, 638, 246 S.E.2d 99, 104 (1978). However, at the same time, the acts of the legislative branch cannot, directly or indirectly, dispense with constitutional requirements. *See, State ex rel. McGraw v. Burton* 212 W.Va. 23, 569 S.E.2d 99 (2002) (legislature may not reduce existence of a constitutional office to a nullity).

Thus, in consideration of both history and our place in the governmental scheme, we hold that, by expressly including the office of Overseers of the Poor in Art. IX, § 2 of the West Virginia Constitution, the framers gave voice to the principle that government has a moral and legal responsibility to provide for the poor. The allocation of this responsibility rests with the Legislature, provided that the support granted is not constitutionally insufficient.

We believe it should go without saying that the public has a vital interest in seeing that

---

fortunate, for example: "Verily I say unto you, Inasmuch as ye have done it unto one of the least of these my brethren, ye have done it unto me."

Matthew Chapter 25. This sort of notion no doubt played a large role in the lives, and thoughts, of the constitutional framers.

the poor are not destitute. We remark again that the great majority of those we refer to as "poor" are children, who did not pick their parents or their circumstances. The TANF program by its very name, Temporary Assistance to Needy *Families,* reinforces this idea.

What happens to these children is of interest to every citizen of this State and every officer of government, even though the poor have little in the way of a lobby.[17] These children can be our future voters, workers, and decision makers, or if ignored, our future drug addicts, inmates, and homeless.[18] We can pay a little to help support them while they are young, or pay a lot to prosecute, defend, and incarcerate many of them when they are older. Even those who may not be moved by notions of charity should be moved by enlightened self-interest, as the problems faced by, and presented by, the poor cannot simply be wished away.

■ Having concluded that our Constitution does demand some degree of assistance for the poor and needy, we turn to the second prong of petitioners' argument, that the termination of cash assistance payments after five years violates this constitutional precept.

We note that cash payments under the TANF program are only one aspect of a multifaceted support system for the poor and needy in this State. In cooperation with the federal government, the State provides housing assistance (*see* 42 U.S.C., Chapter 8), medical benefits (*see* 42 U.S.C., Chapter 7), food stamps (*see* 7 U.S.C.2012, et seq.), public transportation or transportation assistance (*see* W. Va.Code § 9–9–9 and 49 U.S.C.

5311), clothing assistance (*see* W. Va.Code 49–2D–8), educational or vocational programs (*see* W. Va.Code § 9–9–3), and free public education for children (*see* W. Va. Const. Art. 12, § 1). Also, many recipients of cash assistance under the TANF program are eligible to receive social security disability payments from the federal government. Many of these programs are available to recipients for an indefinite period of time.

■ When we review the universe of assistance programs available to West Virginia's poor, we are unable to say that a general policy of terminating cash assistance payments to most recipients after five years violates the spirit of the above-described constitutional concern for the poor. Thus we find that in the presence of other significant assistance or support, the current practice of terminating cash assistance for most recipients after five years, as provided for in West Virginia Code § 9–9–10 (2001), does not violate our State Constitution.

Next we consider whether the Secretary's current system of providing limited extension to certain recipients is somehow violative of our Constitution. Having determined this threshold issue that, in general, the five-year limit is not violative of constitutional protections, we turn to the other arguments advanced by the petitioners concerning the way in which the Secretary deals with extensions to the five-year limit.

The petitioners and their *amici* make numerous attacks upon the validity of the extension process. They maintain that: DHHR fails to give proper notice to those approaching the five-year limit of their abili-

---

17. "The modern ... politician regularly aligns himself not with the poverty-ridden members of the community but with the far more numerous people who enjoy the far more affluent income of (say) the modern trade union member or the intellectual ... Reform now concerns itself with the needs of people who are relatively well-to-do-whether the comparisons be with their own past or with those who are really at the bottom of the income ladder. In consequence, a notable feature of efforts to help the very poor is their absence of any very great political appeal."
Peter B. Edelman, *the Next Century of Our Constitution: Rethinking Our Duty to the Poor,* 39 Hastings L.J. 1, 31 n. 152

18. "The statistical data about education attainment is bleak, indicating that poor children are twice as likely as nonpoor children to drop out of school, repeat a grade, be suspended or be expelled." Katherine Hunt Federle, *Child Welfare and the Juvenile Court,* 60 Ohio St. L.J. 1225, 1242 (1999). Children whose parents earn less than $15,000 are at least 25 times more likely to be neglected than children whose parents earn $30,000. Cynthia R. Maybry, *Second Chances: Insuring That Poor Families Remain Intact by Minimizing Socioeconomic Ramifications of Poverty,* 102 W. Va. L Rev. 607, 614 (2000).

ty to apply for an extension; DHHR fails to apply its own regulations fairly or consistently; DHHR fails to give proper consideration to recipients who are the victims of domestic violence; the federal government would allow DHHR to grant far more extensions; the six-month limit for extensions established by DHHR is arbitrary, capricious, and in excess of the Secretary's statutory authority; and the appeals process for contesting the denial of an extension is flawed.[19]

### B. The "Fair Hearing Examiner"

■ Of these arguments, we are most persuaded by the one listed last—that is, that the appeal process for contesting a denial of an extension is flawed because the Fair Hearing Examiner has no authority to overturn the decision of the Extension Committee. As we noted above, the Special Commissioner determined that the examiner has little authority. According to respondent, DHHR mails notices to recipients in the 48th, 54th and 55th month informing them that their assistance will terminate at the end of 60 months. At approximately the 55th month, the recipient, or his or her caseworker, may apply to the Extension Committee for an extension of assistance payments for one to six months.

If the Extension Committee denies an extension, the recipient may request a reconsideration by the Committee. This appears to be of dubious value, in that the Committee will have just denied the application. In addition, the recipient may request a hearing before a Fair Hearing Examiner, however, "[t]he decision of the OFS Extension Committee to approve or deny an extension is

final and cannot be overturned by a Fair Hearing decision, except when the decision was based on inaccurate information." DHHR TANF Manual, section 15.6 D.

What we glean from a reading of this provision is that no true right of appeal exists within the agency. For example, if a pregnant recipient applies for an extension and is denied because the Committee did not know that she was pregnant, then the Fair Hearing Examiner probably could remand the case because the decision was based on inaccurate information about the pregnancy. However, if the Committee knew that the pregnant applicant were pregnant, but refused her extension request anyway, in apparent violation of the regulations, the Fair Hearing Examiner apparently would have no power to remand the case, because the Committee possessed accurate information.

■ This sort of odd, nonsensical, and irrational result is not acceptable. We have noted before that an important goal of any administrative scheme is "to guarantee the rationality of the process through which results are determined" *See Harrison v. Ginsberg,* 169 W.Va. 162, 171, 286 S.E.2d 276, 281 (1982). The process for granting extensions that is at issue in the instant case falls short of this goal. The Court's decision in *Harrison* was an extension of its logic in another case dealing with the Board of Banking and its duties under the State Administrative Procedures Act, W. Va.Code §§ 29A–1–1 et seq.

When W. Va.Code, 29A–5–3 [1964] says: "Every final order or decision rendered by any agency in a contested case shall be in

---

**19.** Relying upon a report prepared by DHHR, an amicus brief alleges that as of mid–2002, approximately 500 "cut off" notices were mailed to recipients nearing the five-year limit, and that approximately 200 of these recipients requested an extension but only 30 extensions were granted. The brief breaks down the requests based upon the reason given for each. It notes that DHHR granted only one of 18 domestic-violence-based requests, five of 13 pregnancy-based-requests, none of the 15 requests based on a lack of child care, none of the 45 requests based on chronic unemployability, and none of the 96 requests based upon living in an area of "high unemployment." It is interesting to note that, according to DHHR, McDowell County, West Virginia is not an area of "high unemployment."

We note that the web site for the Bureau of Employment Programs indicates a 10.9 percent unemployment rate for McDowell County as of October 2002. *Amici* suggest that this number is artificially low because many of the unemployed have given up as hopeless the search for work, and, incredibly, that many of the current recipients of TANF cash assistance are actually counted among the *employed,* which further distorts the official numbers. This causes us to question whether the respondent is granting as many extensions as might be called for if unemployment figures more accurately reflected the reality faced by those without work.

writing or stated in the record and shall be accompanied by findings of fact and conclusions of law. . . ." the law contemplates a reasoned, articulate decision which sets forth the underlying evidentiary facts which lead the agency to its conclusion. . . .

Syl. pt. 2, *in part, Citizens Bank v. W. Va. Board of Banking and Financial Institutions,* 160 W.Va. 220, 233 S.E.2d 719 (1977); *accord, Muscatell v. Cline,* 196 W.Va. 588, 598, 474 S.E.2d 518, 528 (1996). This Court explained further in *Harrison* that our reasoning in *Citizens Bank* should be extended to the then-Department of Welfare (a forerunner of DHHR), though at the time the Administrative Procedures Act did not bear directly on the challenged actions in that case:

> Our decision in *Citizens Bank* was premised upon the design of administrative law to guarantee the rationality of the process through which results are determined, and upon the necessity of a record for appellate review. Although Citizens Bank dealt with a decision under the Administrative Procedure Act, from which the Department of Welfare is excluded, *see State ex rel. Ginsberg v. Watt, supra*[, 168 W.Va. 503, 285 S.E.2d 367] we recently indicated in *Monongahela Power Company v. Public Service Commission,* W. Va.[, 166 W.Va. 423], 276 S.E.2d 179 (1981), that the principles of *Citizens Bank* are clearly applicable to any administrative review. 276 S.E.2d at 182 n. 4.

*Harrison v. Ginsberg,* 169 W.Va. 162, 171, 286 S.E.2d 276, 281 (1982). As the Special Commissioner found, and we agree, though the petitioners have no property right in the continuation of their cash assistance, they do have a due process right that the system set up by DHHR will operate in a fair, reasonable, and logical fashion. As the Special Commissioner stated:

> In that regard, this Court is of the opinion that, although there may be no property interest in the assistance payments *per se,* the petitioners have established that recipients have a vested or property interest in

the adequacy and fairness of the extension process. In other words, inasmuch as this State has afforded assistance recipients an opportunity to request extensions beyond the 60 month limit and has put in place an Extension Committee and a Fair Hearing process for that purpose, recipients are entitled to an adjudication of their extension requests in a manner consistent with the principles of due process.

Final Recommendations of the Special Commissioner. As this Court has held previously: "Inherent in the republican form of government established by our State Constitution is a concept of due process that insures that the people receive the benefit of legislative enactments." Syl. pt. 1, *Cooper v. Gwinn,* 171 W.Va. 245, 298 S.E.2d 781 (1981). We agree with the Special Commissioner that "the adequacy and fairness of the extension process breaks down at the Fair Hearing level." [20]

■ In his final order, the Special Commissioner directs our attention to the case of *Weston v. Cassata,* 37 P.3d 469 (Colo.App. 2001), in which the Colorado Court of Appeals examined the due process provided to recipients of the TANF program and its counterpart, the Colorado Works Program Act. In that case, the court found that cut-off notices sent out by the State of Colorado failed to provide the recipients with adequate due process protection:

> Although we agree that the "no entitlement" language modifies the unconditional entitlement to welfare benefits previously available under the AFDC program, we do not agree that it vitiates all forms of property rights in welfare benefits. . . . [T]he due process right under the new scheme is not "the guarantee of getting the benefit," but rather the guarantee that, if and when the benefit is granted, the "government will employ a decisionmaking protocol reasonably likely to yield correct application of the legally relevant substantive criteria to the individual case." [citation omitted] . . . [B]ecause plaintiffs had a property right, albeit not an unlimited one, in con-

---

**20.** Petitioners also alleged constitutional due process defects in the notices sent to recipients nearing the five-year (60–month) cut off. While we do not find the notice to be a model of clarity, we agree with the respondent that the notices do not offend due process.

tinued receipt of welfare benefits, plaintiffs were constitutionally entitled to procedural due process.

37 P.3d at 475, 477. We do not wish to engage in a detailed discussion of property rights in this opinion; however, we stress that, while there is no absolute right to the receipt of cash assistance payments in the presence of other meaningful support, once the State has established a scheme for making such payments, the State's scheme must provide the program participants with adequate due process protections.

█ We believe that the current system fails its participants in this regard. As we noted, section 15.6 D of the Manual states:

> The decision of the OFS Extension Committee to approve or deny an extension is final and cannot be overturned by a Fair Hearing decision, except when the decision was based on inaccurate information.

In many cases, this rule strips the "fair" out of the process, leaving only a hearing, and one of dubious value.[21] We also concur with the Special Commissioner that:

> The limited decision making authority of the Fair Hearing Examiner, as described in section 15.6 D. of the WV Income Maintenance Manual, conflicts with the principles expressed in the above authorities and violates the petitioners' property interest in the adequacy and fairness of the extension process.

Final Recommendations of the Special Commissioner.[22]

█ As we noted above, a writ of mandamus will not issue unless three elements coexist: (1) a clear legal right in the petitioner to the relief sought, (2) a legal duty on the part of respondent to do the thing which the petitioner seeks to compel, and (3) the absence of another adequate remedy. Syl. pt. 1, *State ex rel. McLaughlin v. The West Virginia Court of Claims,* 209 W.Va. 412, 549 S.E.2d 286 (2001); *State ex rel. Damron v. Ferrell,* 149 W.Va. 773, 776–77, 143 S.E.2d 469, 472 (1965). We believe that in this case, the petitioners are entitled to relief in mandamus because they have demonstrated that the procedures at the Fair Hearing level violate due process, and no remedy other than mandamus is adequate to correct their problem.

█ Accordingly we adopt the recommendations of the Special Commissioner as to this aspect of petitioners' claims, and direct the respondents to modify the Fair Hearing process to provide the Fair Hearing Examiner with the authority to reverse or remand the decision of the Extension Committee. The Fair Hearing Examiner shall be able to grant an extension, in appropriate cases, up to the applicable limit, and the recipient seeking an extension shall have the right to appear, with or without counsel, present evidence and cross-examine adverse witnesses. Following the evidentiary hearing, the Fair Hearing Examiner shall provide the recipient with a written decision containing findings of fact, conclusions of law and notice concerning the procedures for circuit court review.[23]

21. The Special Commissioner included a comment by counsel for the petitioners in his final recommendations, noting "[T]he most amazing and interesting procedural due process issue in this whole case is the concept that you give somebody a hearing, but in advance, say the hearing examiner [cannot] make any change."

22. The Special Commissioner also found that it would perhaps be better to regard the Fair Hearing Examiner as the true fact finder in this process:

> The Extension Committee, however, limits its review to documentary evidence, which includes documents from the caseworker and any written statements from the recipient. *See, Goldberg, supra,* noting that written submissions are an unrealistic option for most recipients and that, "where·credibility and ve-

racity are at issue, as they must be in many termination proceedings, written submissions are a wholly unsatisfactory basis for decision." 397 U.S. at 269, 90 S.Ct. 1011. Thus, the true fact finder in the extension process is the Fair Hearing Examiner, before whom the parties appear and an evidentiary hearing is conducted. Yet, at that critical point in the process, the Fair Hearing Examiner is powerless to change the result, and that defect, in the opinion of this Court, constitutes a denial of the petitioners' right to due process of law.

23. As recommended by the Special Commissioner, we also direct the respondents to correct, prospectively, the notice sent to recipients concerning the opportunity to request an extension, i.e., the 55th month termination letter and the extension request form attached thereto, to more

Only recipients who applied for and were denied an extension under the old process are eligible for further consideration under our decision today. The respondent is directed to inform such individuals of their rights under the "Fair Hearing" process as modified by this opinion.

### D. Other Arguments of Petitioners

Before concluding, we also examine several other arguments advanced by the petitioners. In addition to the allegations already discussed, the petitioners and their *amici* make numerous attacks upon the validity of the extension process. Specifically, they allege that DHHR fails to give proper consideration to recipients who are the victims of domestic violence; that the federal government would allow DHHR to grant far more extensions; and that the six-month limit for extensions established by DHHR is arbitrary, capricious, and in excess of the Secretary's statutory authority.

#### 1. *Victims of Abuse or Domestic Violence*

Of special concern to us is the appearance that the Secretary's procedures may not provide adequate safeguards for victims of domestic violence or abuse, as contemplated by both the federal and state legislation. The *amici* briefs and our own examination show us that the federal legislation and the accompanying rules are more generous in providing extensions for potential victims of "battering," "sexual abuse," "mental abuse," or "neglect or deprivation of medical care." 42 U.S.C. 408(7)(C). We note that under the "Discussion of Cross–Cutting Issues" which form the preamble to the federal rules, the federal government addresses "Treatment of Domestic Violence Victims" and states:

> We encourage States to give victims the assurance they need that: (1) They will not be cut off assistance when they reach the Federal time-limit if they still need assistance; and (2) they will be able to return to assistance if the need recurs. Such assurances are important because they will alleviate pressure on victims to take steps

that might jeopardize their personal or their family's safety.

(Federal Register, April 12, 1999, 45 C.F.R. Part 260, et al. Temporary Assistance for Needy Families Program (TANF); Final Rule, p. 17746).

The *amici* suggest that as of the spring of 2002, the respondent had granted only one such extension. Our experience with domestic violence and child abuse and neglect cases suggest that this number is out of step with the actual number of TANF recipients who are subject to such traumas. Also, as noted by the Special Commissioner:

> As the evidence revealed, the limited decision making authority of the Fair Hearing Examiner may be especially problematic in the context of domestic violence. "Domestic battery" is listed as a ground for an extension under section 15.6 C. of the Manual. In that regard, a recipient who would not have personally appeared before the Extension Committee may wish to further develop this ground before a Fair Hearing Examiner. The Fair Hearing Examiner, however, would be unable to change the result, and, at best, the recipient is left with a delay—if the case is remanded to the Extension Committee for a reconsideration.

Final Recommendations of the Special Commissioner.

We do not believe that we have sufficient factual development in this case to hold that the Secretary's policies for granting extensions to victims of domestic violence or abuse violate the letter or spirit of the state or federal legislation. However, we urge the Secretary to take the special measures required by the federal government to ensure that victims of domestic violence or abuse get extensions when circumstances so demand.[24]

#### 2. *Six–Month Limit on Extensions and Federal 20 Percent Rule*

 Petitioners and their *amici* find fault with the respondent's policy of limiting all extensions to a maximum of six months and the related fact that a very small percentage

---

accurately reflect the criteria for an extension set forth in section 15.6 of the WV Income Maintenance Manual and other relevant law.

**24.** We also note that there appears to be no federal time limit for extensions in such cases.

of respondent's total TANF caseload has received an extension at all. The *amici* urge us to eliminate the six-month cap on extensions, as it is not required by federal law. Petitioners suggest that, if extensions were available on an ongoing basis, rather than a one-time, six-month basis, respondents would be able to allow for the exigencies affecting individual families, and to support those families whose opportunity to achieve self-sufficiency might be hobbled by the six-month extension limit.

The federal law clearly contains the 60–month lifetime limit mirrored in the State statute we have already discussed.[25] In addition to the 60–month limit, the federal law contains penalties for non-compliance with the limit.[26] However the federal statutes also allow the State to provide extensions beyond this limit. The federal law establishes what it calls a "hardship exemption," and appears to permit up to 20 percent of the caseload to be exempt from time limits. We note that the statute is silent with regard to time limitation for those who continue to · receive cash assistance under this exception:

(C) Hardship exception

(i) In general

The State may exempt a family from the application of subparagraph (A) by reason of hardship or if the family includes an individual who has been battered or subjected to extreme cruelty.

(ii) Limitation

The average monthly number of families with respect to which an exemption made by a State under clause (i) is in effect for a fiscal year shall not exceed 20 percent of the average monthly number of families to which assistance is provided under the State program funded under this part during the fiscal year or the immediately preceding fiscal year (but not both), as the State may elect.

42 U.S.C. 608(7)(C). This language provides the Secretary with two basic reasons for granting an extension, either "hardship" or "extreme cruelty." We have previously noted that our state statute is also silent with respect to extensions of the basic five-year time limit.

The *amici* suggest that the respondent's policy of allowing only one extension of up to six months, based on application to a State level committee and a predetermined list of categories, is overly restrictive. They also note that as of January 2002, the WV WORKS caseload was 14,694, *TNF Provisional Cases, Individuals, Expenditures,* West Virginia Department of Health and Human Resources, July 2000, and that based on this caseload and the 20 percent limit, nearly 2,950 families could be granted an extension to the time limits, but that less than 30 had been granted at that time. They note that there is a striking contrast between the potential number of recipients who could receive an extension and the actual number of extensions granted.

 It is clear that the Secretary has broad authority to conduct the State program, however, we have held that:

> While the interpretation of a statute by the agency charged with its administration should ordinarily be afforded deference, when that interpretation is unduly restrictive and in conflict with the legislative intent, the agency's interpretation is inapplicable.

42 U.S.C. 608(7)(A)

**25.** The Code states:

(7) No assistance for more than 5 years
(A) In general
A State to which a grant is made under section 603 of this title shall not use any part of the grant to provide assistance to a family that includes an adult who has received assistance under any State program funded under this part attributable to funds provided by the Federal Government, for 60 months (whether or not consecutive) after the date the State program funded under this part commences, subject to this paragraph.

**26.** The Code states:

(9) Failure to comply with five-year limit on assistance
If the Secretary determines that a State has not complied with section 608(a)(7) of this title during a fiscal year, the Secretary shall reduce the grant payable to the State under section 603(a)(1) of this title for the immediately succeeding fiscal year by an amount equal to 5 percent of the State family assistance grant. 42 U.S.C. 609(a)(3).

Syl. pt. 5, *Hodge v. Ginsberg*, 172 W.Va. 17, 303 S.E.2d 245 (1983). We must admit we are not certain why the Secretary has chosen to limit all extensions to six months, and we agree with petitioners that the number of extensions granted, as a percentage of the respondent's total TANF caseload, is extremely low.

However, we also recognize that the federal regulation in this area is detailed and demanding, and that there are other programs and services that compete for DHHR's funds and administrative resources. We are not prepared to hold today that the Secretary's choice of a six-month time limit for extensions is "unduly restrictive and in conflict with the legislative intent." Nor are we prepared to say, with the factual development currently available to us, that the correspondingly low number of extensions as a percentage of the total allowed by federal law, merits some corrective action by this Court.

## IV.

### CONCLUSION

For the reasons stated, we grant the Writ of Mandamus, as moulded, and the respondent is directed to modify the "Fair Hearing" process for the granting of extensions as directed in this opinion.

Writ granted as moulded.

MAYNARD, Justice, concurring in part, and dissenting in part.

I concur with the conclusions of the majority opinion that a pre-termination hearing is not required before ending TANF cash assistance due to the expiration of the five-year time limit; the Secretary's policies for granting extensions to victims of domestic violence or abuse do not violate the letter or spirit of the state or federal legislation; and the Secretary's choice of a six-month time limit for extensions is not unduly restrictive and in conflict with the legislative intent. I also agree with the Court's adoption of the Special Commissioner's recommendations to modify the Fair Hearing Process to provide the Fair Hearing Examiner with the authority to reverse or remand the decision of the

Extension Committee. Finally, I concur with the Court's granting of the writ of mandamus as moulded so that those recipients who applied for and were denied an extension under the former process can have their applications reconsidered.

I dissent, however, to new syllabus point 4 which holds that "government has a moral and legal responsibility to provide for the poor," as well as the entire portion of the majority opinion that discusses this holding. Not only is this new syllabus point wholly unnecessary to the disposition of this case, but there simply is no support for the holding.

This Court does not have the authority to impose a moral or legal responsibility on government in the absence of a clear expression in the Constitution or in any statutory law that such a responsibility exists. The entire textual basis for the majority's holding is a single, isolated reference to "overseers of the poor" found in Art. IX, § 2 of the Constitution. According to the majority, the mere mention of "overseers of the poor" grants to the poor of this State a constitutional right to subsistence. I notice that Art. IX, § 2 also says that the county court shall appoint "surveyors of roads." Using the majority's method of analysis, does this mean that the State now has a moral and legal constitutional duty to provide every citizen of the State with a sufficient highway? This is doubtless good news to the large number of rural West Virginians who regularly travel on simply awful roads. In light of the majority opinion, all of these folks can now file a petition for a writ of mandamus with this Court, invoking their right to adequate roads found in Art. IX, § 2 of our Constitution, and this Court will be obliged to direct the Commissioner of Highways to build new roads for the petitioners which meet a minimum level of quality.

I am also troubled by the fact that new syllabus point 4 gives this Court so much power over State welfare policy and funding levels. Simply by declaring that poor people are being deprived of their constitutional right to subsistence, this Court can now mandate changes in State welfare eligibility rules or compel funding increases. Needless to

say, such action would have a significant impact on overall State spending.

Finally, I wish to emphasize that while I certainly support government assistance to the poor, I also strongly support and applaud government efforts, such as the Personal Responsibility and Work Opportunity Reconciliation Act and the WV WORKS Act, to break the welfare cycle and restore welfare recipients to a place of independence and productivity in our society.

In conclusion, I agree with the majority that the petitioners have an interest in the fairness of the extension process, and I concur with that portion of the majority opinion that sets forth new Fair Hearing procedures. For the reasons stated above, however, I dissent to the majority's holding in new syllabus point 4. Accordingly, I concur in part and dissent in part.

STARCHER, Justice, concurring.

(Filed Jan. 6, 2003)

I write separately to make several points.

First, I want to express my appreciation that this Court, consistent with our longstanding jurisprudence, has recognized that the modern State is the ultimate guarantor of a minimal level of subsistence to all of its citizens. (In my opinion, this duty extends to basic medical care, as well as shelter, food, and education.[1])

Far from breaking new ground, this Court is acting in the most conservative fashion, as our decision is grounded in four centuries of Anglo-American statutory, constitutional, and common law, beginning with the English Poor Laws and continuing in our Constitutional Framers' adoption of language explicitly recognizing this duty.

Second, I want to point out that the Court's opinion does not preclude more narrowly drawn claims, even claims possibly seeking limited cash assistance, where other support systems are simply inadequate to achieve a minimal level of subsistence. For example, although governmentally supported housing programs may be available, it appears from the record that if a person has no cash to pay utilities, the housing support will not be made available. My point is that under the majority opinion, it is precisely the facial existence of a wide array of support systems that have the cumulative effect of preventing utter destitution that precludes the petitioners as a class from prevailing on their claim for an extension of cash benefits.

Third, I want to recognize that all of the litigants and counsel in the instant case, and the special master and his team, did a thorough and professional job, that brings credit to them and to our State of West Virginia. Throughout this difficult litigation, all involved, it seems to me, acted with candor, and tried to keep honest human concerns in the forefront. These qualities showed in their work at every level.

Fourth, I especially appreciate the petitioners, who shared the details of their difficult conditions before a court of law. They showed courage that all of us should respect and admire. I am not happy that we as a Court, primarily because of our limited role in a government of divided responsibilities, cannot afford them greater relief.

Finally, while the jurisprudential step that we take by explicitly acknowledging the State's constitutional duty as a last-resort guarantor of subsistence is a significant and positive one, it must be recognized that our decision is "cold comfort" to an innocent child whose family must scrape and suffer, while other children enjoy privilege and surplus.

Thomas Jefferson is reputed to have once said, regarding human slavery and the founding of this Nation, "I tremble for my country when I reflect that God is just."

In rendering a judicial opinion in the instant case, I must of necessity directly acknowledge the terrible injustice of how so many of our children—made in the image of God and part of the human family—are denied a fair chance in life.

---

1. "My concept of human rights has grown to include not only the rights to live in peace, but also to adequate health care, shelter, food, and to economic opportunity. I hope this award reflects a universal acceptance and even embrace of this broad-based concept of human rights." Former President Jimmy Carter, after being chosen for the Nobel Peace Prize.

When I do so—not as a judge, but as a member of that human family, as an American, and as a West Virginian—I cannot feel proud of our society, for all of our achievements.

I feel ashamed. We must do better.