701 S.E.2d 837

Pamela GAINER, Plaintiff
Below, Appellee

v.

Martha Yeager WALKER, Secretary, West
Virginia Department of Health and Hu-
man Resources, and the State of West
Virginia, Defendants Below, Appellants.

No. 34401.

Supreme Court of Appeals of
West Virginia.

Submitted April 8, 2009.

Decided May 19, 2009.

Darrell V. McGraw Jr., Esq., Attorney General, Jennifer Kathleen Akers, Esq., Assistant Attorney General, Charleston, WV, for Appellant.

Loren B. Howley, Esq., Grantsville, WV, for Appellee.

PER CURIAM:

This case is before this Court upon appeal of a final order of the Circuit Court of Calhoun County entered November 2, 2007. In that order, the circuit court reversed the decision of the West Virginia Education and State Employees Grievance Board (hereinafter, the "Grievance Board")[1] which upheld a four-day suspension of the appellee, Pamela Gainer, without pay, by the appellant, Martha Yeager Walker, Secretary of the West Virginia Department of Health and Human Resources (hereinafter, "appellant" or "DHHR"). The circuit court found that the Grievance Board's decision was clearly wrong in view of the reliable, probative, and substantial evidence on the whole record, and ordered the DHHR to pay the appellee lost

---

1. Pursuant to W. Va.Code § 6C–3–1 (2007), made effective July 1, 2007, the West Virginia Public Employees Grievance Board was created, and the West Virginia Education and State Employees Grievance Board was terminated. We will refer to the governing board by the name that was applicable at the time of the underlying controversy, namely the West Virginia Education and State Employees Grievance Board.

wages and reasonable attorney's fees due to her suspension. In this appeal, the DHHR contends that the circuit court erred by reversing the decision of the Grievance Board, and awarding the appellee attorney's fees in the amount of $9,045.00. Based upon the parties' briefs and arguments in this proceeding, as well as the relevant statutory and case law, this Court finds that the circuit court did not commit reversible error and accordingly, affirms the decision below.

# I.

## FACTS

The appellee, Pamela Gainer, is employed by the DHHR as a foster care worker. She began her employment with the DHHR on September 2, 1975, and has worked there on a continuous basis. As a part of her duties, the appellee is required to monitor and report upon the care and welfare of minor children who have been placed in foster homes by the DHHR. On July 10, 2006, the appellee was suspended without pay for four working days for allegedly breaching the confidentiality of sensitive social service case records. Specifically, the appellee obtained recordings from a confidential adoption record and shared them with two attorneys who were not employees of the DHHR.

One of the cases assigned to the appellee by the DHHR, relevant to this appeal, was for a male child, C.S.,[2] who was born November 29, 2002, and was taken into custody by the DHHR in March 2003. C.S., an infant with special medical needs, was placed in the foster home of a woman, herein referred to as S.B., as soon as he was ready to leave the hospital. After C.S.'s placement in S.B.'s home, the appellee made four home visits between April 19, 2003, and August 4, 2004, to assess his care and welfare. On each of these home visits, the appellee recorded in her notes that C.S., who was developmentally delayed, was always in a playpen and did not seem to be getting the attention necessary for his optimal development. She noted that he did not have good large muscle control,

did not walk well, and was not learning to speak properly. The appellee believed that S.B. was not spending enough time with C.S.

According to the appellee, she regularly discussed her concerns with other social workers in her office, but decided she would not seek removal of C.S. from S.B.'s home because he was in the only home he had ever known. She also stated that it was the DHHR's policy to discourage moving foster children after placement with a foster parent as this may create an unstable environment for the child. She also considered the fact that S.B. lived in close proximity to a hospital, which was important considering C.S.'s existing health issues. On September 3, 2004, after the Circuit Court of Calhoun County terminated the parental rights of C.S.'s biological parents, C.S.'s case was transferred to the DHHR's adoption unit and assigned to adoption specialist Jennifer Hogue. C.S. was formally adopted by S.B. on August 29, 2005.

During much of this same time period, the appellee was also a foster care worker for C.S.'s half-sibling, H.T., a female child who was born January 19, 2004. H.T. was placed in a separate foster home and was not initially placed with S.B. With regard to H.T., both S.B. and the family where H.T. had temporarily been placed (hereinafter, "C.H."), wanted to adopt her. As a consequence, a placement hearing was scheduled in the Circuit Court of Calhoun County.

In preparation for her own potential testimony at the hearing, the appellee had obtained access to the DHHR's electronic file on C.S. The appellee believed that reviewing C.S.'s case history was critical to determine if placement of H.T. in S.B.'s home was in the best interests of both, or either, of the children. The file, which contained the appellee's notes, also included Ms. Hogue's notes regarding C.S. After reading Ms. Hogue's notes, the appellee learned that both she and Ms. Hogue had made similar observations regarding C.S.'s care in S.B.'s home. At the September 8, 2005, hearing, however, the appellee concluded that Ms. Hogue had

---

**2.** Our customary practice in cases involving minors is to refer to the children by their initials rather than by their full names. *See, e.g., In re*

*Cesar L.,* 221 W.Va. 249, 252 n. 1, 654 S.E.2d 373, 376 n. 1 (2007).

testified inconsistently from her notes as contained in the DHHR's confidential file regarding C.S.

With regard to the testimony at that hearing, Ms. Hogue stated during direct examination she did not recall ever seeing C.S. in a playpen in S.B.'s home, and that she had no concerns about his care in S.B.'s home. According to the appellee, however, Ms. Hogue had noted in the official case file that C.S. was spending a lot of time in a playpen and that she was concerned about his progress as a developmentally delayed child. Ms. Hogue's notes also indicated that she believed C.S. could not focus and could not communicate, except by grunting, and that he had made very little progress with regard to his developmental delays. Given this information, the appellee, who had printed C.S.'s entire record,[3] provided a copy of Ms. Hogue's notes to the attorney for H.T.'s foster parent as well as to H.T.'s *guardian ad litem.* Those notes were then used to cross-examine Ms. Hogue regarding her previous testimony.

Thereafter, on December 6, 2005, the circuit court, in an eighteen-page order, authorized and empowered the DHHR to separate the siblings, thereby refusing to order placement of H.T. in S.B.'s home. The circuit court's order allowing for separation of the siblings was based, in part, on the appellee's concerns, as well as the appellee's disclosure of Ms. Hogue's notes. It explained that:

> [The appellee's] concern about [C.S.] was corroborated by other [DHHR] workers from Harrison County, who also noticed that [C.S.] spent a lot of time in his playpen. Although she did not recall it when she testified on direct examination, adoption specialist Jennifer Hogue had a concern that [C.S.] spent too much time in his playpen and was otherwise confined to a small portion of the house, as shown by her case notes after her home visit on November 17, 2004.

The appellee contends that she chose to disclose the information to the *guardian ad litem* and counsel for H.T.'s foster mother, instead of the prosecuting attorney, because they were the only lawyers in the case who were actually advocating the DHHR's position, which was that C.S. and H.T. should not be placed together in S.B.'s home. The appellee maintains that throughout the entire case, the prosecutor had demonstrated a history of refusing to cooperate with the DHHR, as evidenced by his statement that, "We'll just sit back and let these foster parents duke it out." She also cited an eight-page report submitted to the circuit court from the DHHR concerning issues surrounding the prosecuting attorney's handling of the case. Thus, given the appellee's belief that the prosecutor was not doing his job, she gave the information to the two attorneys whom she believed "were aggressively advocating the [DHHR's] position regarding the children's best interests."

Following the hearing regarding the custody of H.T., Ms. Hogue filed an internal complaint against the appellee for releasing her notes from C.S.'s confidential file. Subsequent to an investigation of the complaint, on July 10, 2006, the appellee was suspended for four days, without pay, for a breach of the confidentiality of social service case records, which according to the DHHR, violated several of its policies as well as the social workers' code of ethics. During a meeting between the appellee and a DHHR regional director, the appellee admitted that she disclosed the confidential information based on her belief that she needed to do so to protect the best interests of C.S. and H.T.

On July 17, 2006, the appellee initiated a grievance at Level II, protesting her suspension. Her grievance was denied at Level II on July 27, 2006, and on July 28, 2006, the appellee appealed that decision to Level III. Following a September 5, 2006, evidentiary

---

**3.** The appellee testified that she did not know how to print only a select portion of the record which contained her own recordings, so she printed the entire record. She maintains that she did not specifically select Ms. Hogue's notes to print as she had no reason to expect that she would ever have a use for those notes, and that at the time she printed the record, she did not even know that Ms. Hogue would be a witness in H.T.'s case. The ALJ stated in the March 16, 2007, order, that it was unclear from the record whether or not it was possible to separate portions of the file for printing.

hearing, the appellee's Level III appeal was also denied by order dated October 27, 2006. On October 31, 2006, she then appealed her grievance to Level IV, which brought the matter before an ALJ of the Grievance Board. On March 16, 2007, the ALJ upheld the appellee's suspension and concluded that the DHHR,

> has proven by a preponderance of the evidence that [the appellee] violated DHHR confidentiality policies and the Social workers' Code of Ethics, and that a four-day suspension was appropriate under the circumstances presented.

The ALJ also explained that while the appellee's heart was in the right place, she nonetheless broke the DHHR's policies on confidentiality.

On April 13, 2007, the appellee appealed the ALJ's decision to the Circuit Court of Calhoun County. On November 2, 2007, the circuit court reversed the ALJ, finding that "the Level IV grievance decision [was] clearly wrong in view of the reliable, probative and substantial evidence on the whole record." The circuit court concluded that the DHHR deprived the appellee of due process of law by failing to provide her with several documents prior to the Level III hearing, but the appellee was, "nevertheless, able to present evidence which placed her actions within the policy of the [DHHR] prohibiting the release of confidential information." In other words, the circuit court found that the appellee did not violate DHHR policy when she disclosed the confidential information. The circuit court then set aside the DHHR's disciplinary action against the appellee and ordered that the DHHR purge her personnel records of any reference to such disciplinary action. It further ordered that the DHHR was to pay the appellee the wages for the four days of missed work due to her suspension, as well as pay her reasonable attorney's fees and costs. This appeal followed.

## II.

### STANDARD OF REVIEW

■ This case comes before this Court as an appeal from the Circuit Court of Calhoun County, which reversed the decision made by the Grievance Board. The appeal provisions of W.Va.Code § 29–6A–7 (2002)[4] provide that an appeal may be taken to a circuit court where the final grievance decision:

> (1) Is contrary to law or a lawfully adopted rule or written policy of the employer;
>
> (2) Exceeds the hearing examiner's statutory authority;
>
> (3) Is the result of fraud or deceit;
>
> (4) Is clearly wrong in view of the reliable, probative and substantial evidence on the whole record; or
>
> (5) Is arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

More specifically articulated by this Court is the directive that "[a] final order of the hearing examiner for the West Virginia Education and State Employees Grievance Board, made pursuant to W.Va.Code, 29–6A–1, *et seq.*, and based upon findings of fact, should not be reversed unless clearly wrong." Syllabus, *Quinn v. West Virginia Northern Community College*, 197 W.Va. 313, 475 S.E.2d 405 (1996).

■ This instruction is "consistent with our observation that rulings upon questions of law are reviewed *de novo.*" *Quinn*, 197 W.Va. at 316, 475 S.E.2d at 408 (citing *Bolyard v. Kanawha County Bd. of Educ.*, 194 W.Va. 134, 136, 459 S.E.2d 411, 413 (1995)). Moreover, "[a]lthough we accord great deference to the findings of fact of the West Virginia Educational Employees Grievance Board, we review, *de novo*, questions of law." Syllabus Point 2, *Maikotter v. University of W. Va. Bd. of Trs.*, 206 W.Va. 691, 527 S.E.2d 802 (1999). *See also Martin v. Randolph County Bd. of Educ.*, 195 W.Va. 297, 304, 465 S.E.2d 399, 406 (1995) ("We review *de novo* the conclusions of law and application of law to the facts."). Because this Court reviews decisions of the circuit court under the same standard used by the circuit court in reviewing the decisions of an ALJ, it is clear that this Court employs a combination of deferential and plenary review. More particularly,

4. *See* footnote 1, *supra.*

[g]rievance rulings involve a combination of both deferential and plenary review. Since a reviewing court is obligated to give deference to factual findings rendered by an administrative law judge, a circuit court is not permitted to substitute its judgment for that of the hearing examiner with regard to factual determinations. Credibility determinations made by an administrative law judge are similarly entitled to deference. Plenary review is conducted as to the conclusions of law and application of law to the facts, which are reviewed *de novo*.

Syllabus Point 1, *Cahill v. Mercer County Board of Education*, 208 W.Va. 177, 539 S.E.2d 437 (2000).

■ Also at issue in this case is the circuit court's award of attorney's fees. This Court applies an abuse of discretion standard when reviewing a circuit court's award of such fees. *See Beto v. Stewart*, 213 W.Va. 355, 359, 582 S.E.2d 802, 806 (2003) ("The decision to award or not to award attorney's fees rests in the sound discretion of the circuit court, and the exercise of that discretion will not be disturbed on appeal except in cases of abuse.").

Accordingly, we proceed with our examination of the assigned errors with these standards in mind.

## III.

## DISCUSSION

The DHHR maintains that the circuit court erred in reversing the ALJ's decision to uphold the appellee's four-day-suspension. The DHHR contends that while the appellee claimed she disclosed confidential information to prevent imminent, foreseeable, harm to the child involved in the underlying adop-

tion case, she never established in her appeal to the circuit court that such harm existed. The DHHR argues that at the Level III hearing, which was the only occasion where testimony was taken, it was clearly established that no imminent harm was present.

The DHHR also asserts that the circuit court reviewed the case under an inappropriate analysis. In that regard, the DHHR maintains that instead of reviewing the record to determine whether the ALJ properly held that the appellee violated the DHHR's rules and regulations, and whether the appellee had established her affirmative defense that she was justified in releasing the notes, the circuit court reviewed the record to determine if the appellee acted in the best interests of the child. The DHHR further states that the circuit court erred by only relying on the December 7, 2005, order of the circuit court that provided for the separation of C.S. and H.T.

Conversely, the appellee argues that the circuit court appropriately reviewed the application of law to the facts *de novo* and correctly found that the ALJ's decision was clearly wrong in view of the reliable, probative, and substantial evidence on the whole record. She states that the circuit court understood that her concern was not that C.S. was in imminent danger in S.B.'s home, but rather that imminent danger would occur to C.S. or H.T., or to both children, if H.T. were added to S.B.'s home. We agree.

■ It is undisputed by either party that the appellee, and/or other DHHR employees, are justified in disclosure of sensitive information from the DHHR's pre-adoption case records when it is necessary to prevent serious, foreseeable, and imminent harm to a child.[5] What the DHHR does dispute, how-

---

**5.** While "imminent harm" is not defined by relevant statutes, policies, or case histories, "imminent danger" is described in Child Protective Service policy § 3.16, as well as codified at W.Va.Code § 49–1–3 (2007), as:

Imminent danger to the physical well-being of a child means an emergency situation in which the welfare or life of the child is threatened. Such an emergency situation exists when there is reasonable cause to believe that any child in the home is or has been sexually abused or sexually exploited, or reasonable cause to be-

lieve that the following conditions threaten the health or life of any child in the home.

● Non accidental trauma inflicted by a parent, guardian, custodian, sibling, babysitter or other caretaker which can include intentionally inflicted major bodily damage such as broken bones, major burns or lacerations or bodily beatings. This condition also includes the medical diagnosis of battered child syndrome which is a combination of physical and other signs indicating a pattern of abuse; or

ever, is whether such a danger of serious, foreseeable harm was present in this case.

Upon review of the record it is clear that there was a danger of serious, foreseeable harm present and therefore, the appellee was justified in disclosing the information in C.S.'s case file. In that regard, there was substantial evidence presented to the ALJ and to the circuit court demonstrating that S.B. could not give adequate attention to another child in her home. S.B. was a single mother, in her fifties, in remission from cancer, with five other children in her home, at least two of whom had special needs. Those conditions alone would not, in and of themselves, warrant such a conclusion; however, at about the same time as the placement hearing was held for H.T., there had been allegations that S.B. was unable to provide sufficient attention to the children already in, her home, and that the DHHR's investigation unit was conducting an investigation of those allegations. Some of the allegations, made by a former foster child in S.B.'s home, were that S.B. had left children outside in the rain, refused to allow children to eat when they were hungry, was distracted from caring for the children because she was drinking beer with friends, and had left C.S. in a high chair and in his playpen for extended periods without any contact.[6]

Moreover, we find equally important, the circuit court's November 2, 2007, order, wherein it outlined the following:

- that Calhoun County CPS workers had been advised not to place any additional children in S.B.'s home;
- that the appellee's supervisor testified there was investigative information regarding allegations that S.B. had locked children, under her care, out of her home;
- that the "Home Finder" in the Harrison County area told Calhoun County DHHR employees not to place any children in S.B.'s home;

- Nutritional deprivation; or
- Abandonment by the parents, guardian or custodian; or
- Inadequate treatment of serious illness or disease; or
- Substantial emotional injury inflicted by a parent, guardian or custodian.

- that the Calhoun County CPS took a firm position that C.S. and H.T. should not be placed together in S.B.'s home;
- that the appellee's supervisor opined that imminent danger would occur to either C.S. or H.T., or both, if H.T. were added to S.B.'s home;
- that the ALJ's decision focused on whether C.S. should have remained in S.B.'s home, whereas the appellee's concern was the risk of harm if H.T. was placed in S.B.'s home;
- that the appellee's concern was corroborated by the opinion of her supervisor and was established by convincing evidence that was adopted by the circuit court in its decision to separate the siblings, C.S. and H.T., in a separate custody hearing;
- that under the circumstances as they transpired in the hearing before the circuit court, it was understandable that the appellee disclosed the information that was then used to refresh Ms. Hogue's memory, which information was in agreement with that of the appellee;
- that the failure of the ALJ to recognize the potential harm to these children led the ALJ to arrive at the incorrect conclusion that the appellee's actions were not consistent with DHHR policy; and
- that the ALJ's view of harm to the client was misplaced.

It is clear from the record that the appellee, as well as other DHHR employees, expressed their strong concerns that even though C.S. was the only pre-school age child in S.B.'s home, that he was not getting adequate attention. Thus, if C.S. were not receiving adequate attention prior to the placement of an additional child in his home, it is reasonable to conclude that adding a sixth child to S.B.'s home would have necessarily resulted in C.S. receiving even less attention.

6. These allegations cause concern even as to the placement of the other children already in S.B.'s home, but this issue is not before the Court.

It is further reasonable to conclude that H.T., who was approximately one year and three months younger than C.S., would not have received adequate attention in a home with six children. The circuit court, following a September 9, 2005, custody hearing, obviously agreed with such a conclusion as it held that placement of H.T. with C.S. "was not in the best interests of either child" and that there was "clear and convincing evidence that ... justifies separation of these siblings."

It is further clear that given the circumstances surrounding the September 9, 2005, hearing, the appellee released Ms. Hogue's notes because she believed she needed to act immediately in order to prevent harm to C.S. and H.T. Prior to the hearing, the circuit court had returned an order on August 8, 2005, allowing for placement of H.T. with S.B. Thereafter, on August 16, 2005, C.H. filed a "Motion to Stay the Transfer of Physical Custody and/or Motion to Continue Placement of the Child [H.T.] with the Foster Mother [C.H.]." The circuit court then agreed to revisit its August 8, 2005, ruling, and scheduled the September 9, 2005, hearing. Thus, it was not until additional information was presented at the September 9, 2005, hearing, including Ms. Hogue's notes contradicting her direct testimony during that hearing, that the circuit court rescinded its earlier order, and found that placement of H.T. in S.B.'s home was not in the best interests of that child. Accordingly, the appellee believed that her inaction during the hearing would have placed vulnerable children at risk of harm.

The appellee contends, and this Court agrees, that the only person harmed by her disclosure of the underlying information, given the specific facts of this case, was Ms. Hogue, due to the fact that her direct testimony differed from her documented observations in S.B.'s home. Nonetheless, regardless of any potential embarrassment on behalf of Ms. Hogue, it is not the purpose of the DHHR's confidentiality policy to shield social workers from embarrassment at the expense of vulnerable children. The record below demonstrates that the appellee disclosed a very limited portion of a child's confidential records to protect that child, and the child's sibling, from imminent harm. Consequently, we believe that the appellee disclosed the information for proper reasons and that the circuit court correctly found that:

> [t]he failure of the ALJ to recognize the potential harm to these children which concerned [the appellee,] lead the ALJ to arrive at the conclusion that [the appellee's] actions in revealing the confidential information was not within Department policy ... the [ALJ's] decision in this matter is clearly wrong in view of the reliable, probative and substantial evidence on the whole record. [The appellee's] actions, in this instance, were entirely appropriate to prevent serious, foreseeable and imminent harm to [H.T.], certainly, and to [C.S.] as well.

In summary, it is clear from the record that the appellee acted appropriately and in compliance with the applicable confidentiality policy. She believed that her actions were necessary to prevent harm to the DHHR's clients, two vulnerable children in separate child abuse and neglect cases. It is further apparent from its order, that the circuit court reviewed the ALJ's application of law to the facts *de novo*, as it was required to do, and determined that the ALJ's conclusions of law and application of law to the facts were clearly wrong in view of the reliable, probative, and substantial evidence on the whole record. Accordingly, with regard to this issue, we affirm the circuit court's November 2, 2007, order, reversing the ALJ's March 16, 2007, decision.[7]

7. The DHHR's appeal was focused on whether the circuit court erred in finding that disclosure to both the *guardian ad litem* and counsel for C.H., by the appellee, was proper, in light of its contention that no imminent harm was present justifying such disclosure. In spite of our finding that there was a danger of serious, foreseeable harm present, this Court also notes that the *guardian ad litem* had a right to such information, since the issue of the September 9, 2005, placement hearing, dealt with the best interests of H.T. Moreover, H.T.'s interests were paramount to the DHHR as well as H.T.'s *guardian ad litem*. As this Court explained in *In re Christina W.*, 219 W.Va. 678, 683–684, 639 S.E.2d 770, 775–776 (2006):

■ The DHHR also assigns as error the circuit court's decision to award the appellee attorney's fees in the amount of $9,045.00, pursuant to W.Va.Code § 6C–2–6(b) (2007). W.Va.Code § 6C–2–6(b), provides:

(b) In the event a grievant or employer appeals an adverse level three decision to the circuit court of Kanawha County, or an adverse circuit court decision to the Supreme Court of Appeals of West Virginia, and the grievant substantially prevails upon the appeal, the grievant may recover from the employer court costs and reasonable attorney's fees for the appeal to be set by the court.

The DHHR argues that the circuit court should have applied W.Va.Code § 29–6A–10 (1998), which provides:

If an employee appeals to a circuit court an adverse decision of a hearing examiner rendered in a grievance proceeding pursuant to provisions of this article or is required to defend an appeal and the person substantially prevails, the adverse party or parties is liable to the employee, upon final judgment or order, for court costs, and for reasonable attorney's fees, to be set by the court, for representing the employee in all administrative hearings and before the circuit court and the supreme court of appeals, and is further liable to the employee for any court reporter's costs incurred during any administrative hearings or court proceedings: Provided, That in no event shall such attorney's fees be awarded in excess of a total of one thousand five hundred dollars for the administrative hear-

ings and circuit court proceedings nor an additional one thousand dollars for supreme court proceedings: Provided, however, That the requirements of this section shall not be construed to limit the employee's right to recover reasonable attorney's fees in a mandamus proceeding brought under section nine of this article.

The DHHR contends that the circuit court incorrectly applied a new section of the Code, W.Va.Code § 6C–2–1 et seq., which repealed § 29–6A–1, et. seq., effective July 1, 2007.[8] The DHHR states that W.Va.Code § 6C–2–1 et seq., was promulgated by the West Virginia Legislature as a new grievance procedure for public employees, and that all grievances filed on or after July 1, 2007, follow the procedures set forth in the new statute, while grievances filed prior to July 1, 2007, follow the procedures found in the old statute. Since the appellee's grievance was filed prior to July 1, 2007, the DHHR maintains that an award of attorney's fees was governed by W.Va.Code § 29–6A–10.

The DHHR points out that the appellee filed her Level II grievance on July 17, 2006, challenging her four-day suspension without pay. Her grievance was denied at that level, and was then denied at Level III on October 27, 2006. That denial was appealed to Level IV on October 31, 2006, and the ALJ issued its decision on March 16, 2007. The appellee then appealed the ALJ's decision to the circuit court on April 13, 2007. Thus, according to the DHHR, the appellee's grievance was already filed in the circuit court when the new statute became effective and, therefore,

The predominant charge to lawyers representing children involved in abuse and neglect cases is that the best interests of the children is of paramount concern. *In re Amber Leigh J.*, 216 W.Va. 266, 272, 607 S.E.2d 372, 378 (2004) (per curiam) ("Of course, [in abuse and neglect cases] the best interests of the child are paramount." (internal quotations and citation omitted)); Syl. pt. 3, in part, *In re Katie S.*, 198 W.Va. 79, 479 S.E.2d 589 (1996) ("[T]he primary goal in cases involving abuse and neglect, as in all family law matters, must be the health and welfare of the children."); *In re Jeffrey R.L.*, 190 W.Va. 24, 32, 435 S.E.2d 162, 170 (same); *Michael K.T. v. Tina L.T.*, 182 W.Va. 399, 405, 387 S.E.2d 866, 872 (1989) ("[T]he best interests of the child is the polar star by which decisions must be made which affect children."). Thus, guardians ad litem

serve a dual role. In addition to serving as an advocate for the child[ren], they must also fulfil their duty to fully inform themselves of the child[ren]'s circumstances and determine and recommend the outcome that best satisfies the child[ren]'s best interests. This Court recently alluded to the dual capacity of a guardian ad litem in the case of *In re Elizabeth A.*, 217 W.Va. 197, 204, 617 S.E.2d 547, 554 (2005) (per curiam), wherein we observed that "[d]uring the proceedings in an abuse and neglect case, a guardian ad litem is charged with the duty to faithfully represent the interests of the child *and* effectively advocate on the child's behalf." (emphasis added).

8. *See* footnote 1, *supra*.

clearly falls under the old statute, which limits her recovery to a maximum of $1,500.00 in attorney's fees.

Conversely, the appellee maintains that the circuit court correctly awarded her attorney's fees incurred as a result of her successful prosecution of her grievance. In her brief before this Court, the appellee states that she substantially prevailed in her case, and, pursuant to W.Va.Code § 6C–2–6(b), there is no limit on the amount of attorney's fees that a circuit court may award to a successful grievant. The appellee conceded, however, during oral arguments before this Court, that this case would fall under the old statute, i.e., W.Va.Code § 29–6A–10. Nonetheless, she argues that under principles of equity, she is still entitled to her reasonable attorney's fees in the amount of $9,045.00, in spite of any potential statutory limitation.

Upon review, it is clear that the statute in effect at the time of the underlying grievance proceeding was W.Va.Code § 29–6A–10. *See e.g. Dodd v. Potomac Riverside Farm, Inc.,* 222 W.Va. 299, 308 n. 1, 664 S.E.2d 184, 193 n. 1 (2008) ("The parties agree that this statute, which was repealed in 2002, is applicable to the instant proceeding as it was in effect at the time the instant proceeding was initiated."). *See also State ex rel. Clark v. Blue Cross Blue Shield of West Virginia, Inc.,* 203 W.Va. 690, 696 n. 12, 510 S.E.2d 764, 790 n. 12 (1998); *Griffith & Coe Advertising v. Farmers & Merchants Bank and Trust,* 215 W.Va. 428, 431, 599 S.E.2d 851, 854 (2004); *Hoover v. Moran,* 222 W.Va. 112, 121 n. 7, 662 S.E.2d 711, 720 n. 7 (2008), *State ex rel. Ins. Com'r of State of West Virginia v. Blue Cross and Blue Shield of West Virginia, Inc.,* 219 W.Va. 541, 557 n. 3, 638 S.E.2d 144, 160 n. 3 (2006); and *Beard v. Lim,* 185 W.Va. 749, 754 n. 7, 408 S.E.2d 772, 777 n. 7 (1991). Nonetheless, our review of this issue does not end there.

This Court has explained that, "[l]itigants are normally responsible for paying their own attorney's fees unless court rule, statute or express contract provision provides otherwise." Syllabus Point 2, *Sally–Mike Properties v. Yokum,* 179 W.Va. 48, 365 S.E.2d 246 (1986). However, we have further held that, "[t]here is authority in equity

to award to the prevailing litigant his or her reasonable attorney's fees as 'costs,' without express statutory authorization, when the losing party has acted in bad faith, vexatiously, wantonly or for oppressive reasons." Syllabus Point 3, *Sally–Mike Properties v. Yokum,* 179 W.Va. 48, 365 S.E.2d 246 (1986).

As previously discussed, the circuit court found that the DHHR deprived the appellee of due process by failing to provide her with numerous documents prior to the Level III hearing. The circuit court first noted that:

> Apparently, this is the only instance in [the appellee's] 30 years of employment with the [DHHR] that she has been the subject of disciplinary action. While the monetary loss to [the appellee] may be slight, the notation of a disciplinary action against her would be permanently on her employment record and might affect her ability to advance her career with the [DHHR].

The circuit court then explained:

> The [DHHR] was in possession of several documents it intended to and did submit into evidence at the Level III hearing. Among those are a memorandum from Jennifer Hogue, which was considered the complaint against [the appellee] (R–3), and which set out in some detail the underlying facts alleged to support the complaint; several e-mails (R–5 through R–7) and a report of investigation (E–1), which set out in substantial detail the course of the investigation and the findings of the investigator. Since all of this information was disclosed at the Level III hearing, this Court can see no justification for the [DHHR's] failure to make this information available to [the appellee] and her counsel in order that the grievant could properly prepare a response. This concerns the Court.

The DHHR has never offered any explanation for its failure to provide the appellee with the documents outlined by the circuit court, except for a brief mention of the requested emails. The DHHR stated that it had attempted to locate, but could not find, all of the emails requested by the appellee, and then declared that the emails were not relevant to the appellee's case. We find the

DHHR's response unacceptable and inadequate with regard to its failure to provide the appellee with documents that it had in its possession, resulting in a violation of her due process.

This Court is further troubled by the fact that the DHHR failed to recognize the appellee's actions, in releasing Ms. Hogue's notes, were taken strictly in the best interests of two vulnerable children who were under the DHHR's care.[9] Even the ALJ noted that the appellee's "heart was in the right place," in spite of its subsequent conclusion that "rules are rules" in denying the appellee's grievance. Moreover, as the circuit court recognized, the importance of the appellee's actions in releasing Ms. Hogue's notes were critically important to the decision to separate the siblings. The circuit court explained:

> [t]he evidence utilized to refresh Ms. Hogue's memory caused her testimony to be in agreement with that of [the appellee] (Finding of Fact No. [28], Judge Evans' order 12–6–05). It is clear that Judge Evans considered the information to be of critical importance in his decision to separate the siblings, since he had concluded at an earlier hearing that the [DHHR] had not met its burden to prove by clear and convincing evidence that the failure to unite [C.S.] and [H.T.] is in the best interest of either child.

The appellee made a split-second decision during a hearing wherein a determination would immediately be made by a circuit court concerning the welfare of two children. She was faced with a prosecutor whom she, and other DHHR employees, believed was not advocating its interests, as well as testimony from a co-worker that was inconsistent with that individual's previously recorded notes. She could have sat silently while at least two children faced potential harm. Instead, she was forced to make a difficult and quick decision in the best interests of those children and, rather than being applauded for her efforts, she was punished with a four-day suspension, a loss of pay, and her first-ever blemish on a more than thirty-year record with the DHHR. Then, even while she attempted to fight her suspension, she was stonewalled at every turn as the DHHR withheld critical information from her. The withholding of such information, which the circuit court correctly found was a violation of the appellee's due process rights, necessarily prolonged this case leading to a significant increase in the appellee's attorney's fees.

Under these circumstances, the appellee should not have to bear the burden caused by the DHHR's failure to act in an expedient and appropriate manner throughout these proceedings. Accordingly, due to the clear violation of the appellee's due process rights, the DHHR acted in a vexatious manner, i.e., "without reasonable or probable cause or excuse,"[10] in failing to provide the appellee with the documents she requested, and needed, to properly present her grievance. As we have further explained herein, the DHHR had those documents in its possession and has no offered no explanation for its failure to provide them to the appellee. Consequently, the circuit court's award of $9,045.00, plus interest, is not contrary to law. See Syllabus Point 3, *Yokum, supra.*

## IV.

## CONCLUSION

For the reasons set forth above, the November 2, 2007, final order of the Circuit Court of Calhoun County is affirmed.

Affirmed.

Chief Justice BENJAMIN concurs, in part, and dissents, in part, and reserves the right to file a separate opinion.

---

**9.** This Court is also perplexed by the swift action taken against the appellee, while, at the same time, the DHHR seemed to express no concern that Ms. Hogue apparently chose not to review her notes prior to the September 9, 2005, hearing, and then provided conflicting testimony that could have resulted in harm to the two children in question.

**10.** *See* Black's Law Dictionary 1596 (8th Edition.1999).