IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2013 Term

_____

No. 12-0775

_____

**FILED**

**November 6, 2013**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

PATRICIA HUDSON,
Petitioner Below, Petitioner

v.

KAREN L. BOWLING, Secretary,
West Virginia Department of Health & Human Resources, and
STEPHEN M. BAISDEN, State Hearing Officer,
West Virginia Department of Health & Human Resources,
Respondents Below, Respondents

_____

Appeal from the Circuit Court of Kanawha County
The Honorable James C. Stucky, Judge
Civil Action No. 12-AA-5

REVERSED AND REMANDED WITH DIRECTIONS
_____

Submitted: October 16, 2013
Filed: November 6, 2013

Bruce Perrone, Esq.
Legal Aid of West Virginia
Counsel for Petitioner

Patrick Morrisey, Esq.
Attorney General
Michael Jackson, Esq.
Assistant Attorney General
Counsel for Respondents

JUSTICE WORKMAN delivered the Opinion of the Court.

JUSTICE LOUGHRY concurs and reserves the right to file a concurring opinion.

SYLLABUS BY THE COURT

1. "Under *W. Va. Code*, 29A-1-2 [1964], the Administrative Procedures Act does not apply to the Department of Welfare." Syl. Pt. 1, *State ex rel. Ginsberg v. Watt*, 168 W. Va. 503, 285 S.E.2d 367 (1981).

2. "A writ of certiorari in the Circuit Court of Kanawha County is the proper means for obtaining judicial review of a decision made by a state agency not covered by the Administrative Procedures Act." Syl. Pt. 2, *State ex rel. Ginsberg v. Watt*, 168 W. Va. 503, 285 S.E.2d 367 (1981).

3. "'[T]he circuit court has a large discretion in awarding [a writ of certiorari] . . . and, unless such discretion is plainly abused, this Court cannot interfere there with.' Syllabus Point 1, in part, *Michaelson v. Cautley*, 45 W. Va. 533, 32 S.E. 170 (1898)." Syl. Pt. 1, *Wysong ex rel. Ramsey v. Walker*, 224 W. Va. 437, 686 S.E.2d 219 (2009).

4. "'On certiorari the circuit court is required to make an independent review of both law and fact in order to render judgment as law and justice may require.' Syllabus Point 3, *Harrison v. Ginsberg*, 169 W. Va. 162, 286 S.E.2d 276 (1982)." Syl. Pt. 2, *Wysong ex rel. Ramsey v. Walker*, 224 W. Va. 437, 686 S.E.2d 219 (2009).

5. "'Unless otherwise provided by law, the standard of review by a circuit court in a writ of certiorari proceeding under W. Va. Code § 53-3-3 (1923) (Repl. Vol. 2000) is de novo.' Syllabus Point 2, *State ex rel. Prosecuting Attorney of Kanawha County v. Bayer Corp.*, 223 W. Va. 146, 672 S.E.2d 282 (2012)." Syl. Pt. 3, *Wysong ex rel. Ramsey v. Walker*, 224 W. Va. 437, 686 S.E.2d 219 (2009).

6. "When, after judgment on certiorari in the circuit court, a writ of error is prosecuted in this court to that judgment, a decision of the circuit court on the evidence will not be set aside unless it clearly appears to have been wrong." Syl., in part, *Snodgrass v. Bd. of Educ. of Elizabeth Indep. Dist.*, 114 W. Va. 305, 171 S.E. 742 (1933).

7. Where the West Virginia Department of Health & Human Resources provides notice of an overpayment to an individual receiving food stamp benefits pursuant to the Supplemental Nutrition Assistance Program, 7 United States Code §§ 2011 to 2036(a) (2012), said notice must contain, at a minimum: (1) an explanation of the proposed action and the reason therefor, in simplified form and easily understandable language; and (2) a reference to all applicable sections of the *DHHR Common Chapters Manual*. Where the notice does not comply with these requirements, the burden is on the Department to establish, by a preponderance of the evidence, that the food stamp recipient was not prejudiced thereby

in his or her ability to contest the overpayment claim.  Where the trier of fact concludes that the recipient was in fact prejudiced, the overpayment claim shall be dismissed.  Where the trier of fact concludes that the recipient was not prejudiced, the overpayment claim may proceed to decision on the merits.

8.     Where the West Virginia Department of Health & Human Resources provides notice of an overpayment to an individual receiving food stamp benefits pursuant to the Supplemental Nutrition Assistance Program, 7 United States Code §§ 2011 to 2036(a) (2012), and the food stamp recipient requests a hearing, the recipient has a right of access to his or her entire case file.  Where the Department unreasonably obstructs or impedes a recipient's right of access to the file,  the burden is on the Department to establish, by a preponderance of the evidence, that the food stamp recipient was not prejudiced thereby in his or her ability to contest the overpayment claim.  Where the trier of fact concludes that the recipient was in fact prejudiced, the overpayment claim shall be dismissed.  Where the trier of fact concludes that the recipient was not prejudiced, the overpayment claim may proceed to decision on the merits.

9.    A determination of whether individuals "live together" within the meaning of the Supplemental Nutritional Assistance Program, 7 United States Code § 2012(n)(2) (2012),

requires the application of reasonable judgment based on all relevant circumstances of a particular living arrangement. Evidence that individuals use the same mailing address may be considered, but is not, in and of itself, conclusive of the issue.

Workman, Justice:

In this case involving an alleged overpayment of food stamp benefits under the Supplemental Nutrition Assistance Program, 7 United States Code §§ 2011 to 2036(a) (2012) (hereinafter "SNAP")[1], the respondent, Karen L. Bowling, Secretary, West Virginia Department of Health & Human Resources (hereinafter "DHHR" or "the Department"),[2]

---

[1]Under SNAP, low-income households receive benefits "which will permit [them] to obtain a more nutritious diet through normal channels of trade by increasing food purchasing power for all eligible households who apply for participation." 7 U.S.C. § 2011. To this end, Congress set forth the following declaration of policy, in relevant part:

> It is declared to be the policy of Congress, in order to promote the general welfare, to safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households. Congress finds that the limited food purchasing power of low-income households contributes to hunger and malnutrition among members of such households. Congress further finds that increased utilization of food in establishing and maintaining adequate national levels of nutrition will promote the distribution in a beneficial manner of the Nation's agricultural abundance and will strengthen the Nation's agricultural economy, as well as result in more orderly marketing and distribution of foods.

*Id.*

[2]Since the docketing of this appeal, Karen L. Bowling has been appointed as Secretary, West Virginia Department of Health & Human Resources, succeeding Michael J. Lewis, originally a named respondent herein. Rule 41 of the West Virginia Rules of Appellate Procedure provides, in relevant part, that "[w]hen a public officer is a party to an appeal or other proceeding in the Supreme Court in his official capacity and during its pendency dies, resigns, or otherwise ceases to hold office, the action does not abate and his successor is automatically substituted as a party. Proceedings following the substitution shall be in the name of the substituted party[.]"

maintains that the petitioner, Patricia Hudson (hereinafter "the petitioner"), and her husband, Harold Hudson (hereinafter "Mr. Hudson"), were living together for seventeen months after the petitioner had filed to receive food stamps as a separated spouse in a one-person household. During an administrative hearing, DHHR presented evidence demonstrating that the petitioner and Mr. Hudson used the same mailing address during the relevant period; that Mr. Hudson lived on the petitioner's property, although not in her home, for the first four months of the period; that Mr. Hudson's name was not removed from either the petitioner's utility bills or the couple's bank account; and that the petitioner drove Mr. Hudson to medical appointments, thus demonstrating that the two continued to function as a couple. Hearing examiner Stephen M. Baisden (hereinafter "respondent Baisden" or "the hearing examiner") concluded in relevant part that

> 2. Department's representative submitted evidence to indicate [the petitioner] and her spouse lived together during the repayment period of May 2010 to September 2011. They shared utilities, they shared liquid assets, and they shared the property at 7856 Ridgeview Nellis Road.
>
> 3. Neither [the petitioner] nor her spouse submitted sufficient evidence to support their claim that they had separate residences.

On certiorari, the Circuit Court of Kanawha County reviewed respondent Baisden's findings of fact and conclusions of law and held that "it is logical to conclude that Petitioner and her spouse lived in the same household during the repayment period of May 2010 to

September 2011 . . . [a]ccordingly, the Court concludes that the Respondent's [sic] establishment of a repayment claim against Petitioner's SNAP benefits is correct." This appeal followed.

Upon careful consideration of the parties' briefs, the oral arguments, the appendix record, and the applicable law, we reverse the judgment of the circuit court and remand this case for entry of an order granting the petitioner's petition for a writ of certiorari and dismissing the DHHR's overpayment claim.

## I. FACTUAL AND PROCEDURAL HISTORY

At the time of the disallowance at issue in this case, the petitioner was sixty-four years old and had an income of $697.00 per month ($8,364.00 per year) from Social Security Disability and Supplemental Security Income benefits. In addition, following her application in May, 2010, for SNAP benefits, which application recited that she was the sole resident in her home and had no income other than her own, she received $146.00 per month in food stamps. The petitioner lived in a home which had been financed for her by her son; pursuant to an installment agreement, she pays $250.00 per month on the loan.[3]

---

[3]Although both the petitioner and Mr. Hudson lived in the home at the time it was purchased, Mr. Hudson's name was not placed on the deed due to what the petitioner characterized as "his alcoholism and erratic behavior." Rather, the petitioner and her daughter were, and are, the owners of the property. The petitioner's son testified that his mother has never missed a payment under the installment agreement.

In late April, 2009 or 2010,[4] the petitioner ordered her husband out of the house due to his drinking, telling him he was welcome to come back whenever he quit. Thereafter, from May, 2010, through August, 2010, Mr. Hudson lived in a camper that was owned by his brother but located on the petitioner's property.[5] Mr. Hudson ran an extension cord from the petitioner's home to the camper, and therefore his electricity usage was included in the petitioner's electricity bill for the house.[6] The camper did not have a water hookup, and Mr. Hudson showered at his daughter's home. His daughter did most of his laundry and prepared his meals. The petitioner testified, without contradiction, that from the moment she threw Mr. Hudson out of the home, he never set foot in it again, even to use the bathroom or the telephone. He kept no clothes, toiletries or personal items in the petitioner's home.

In August, 2010, Mr. Hudson began to live at his mother's home, which was vacant following her admission to a nursing facility. Following her death in November, 2010, and as a result of some family acrimony which ensued, Mr. Hudson's brother removed the

---

[4]The testimony of record evidences constant confusion on the part of the witnesses as to whether the petitioner and Mr. Hudson separated in late April, 2009, or late April, 2010. However, this confusion as to dates is irrelevant, since the overpayment period at issue is from May, 2010, through September, 2011.

[5]*See* n. 4 *supra*. The record is clear that wherever Mr. Hudson may have hung his hat prior to May, 2010, it was then that he began living in the camper and it was then that the petitioner applied for food stamps as a separated spouse in a one-person household.

[6]Both the petitioner and Mr. Hudson testified that he reimbursed his wife for "some" of the electric bill attributable to his usage in the camper.

-4-

camper from the petitioner's property. Thereafter, Mr. Hudson lived a peripatetic existence, staying at various times at the homes of his daughter, his son, his stepdaughter, his sister, and at other locations in Boone County, West Virginia.

The petitioner admitted that she never removed Mr. Hudson's name from the utility accounts for electricity and water, and that she never removed his name from the couple's joint bank account.[7] Further, the evidence showed that Mr. Hudson listed the petitioner's address as his own when he renewed his driver's license in 2011. In that regard, he testified that he had tried to list his separate post office box address, but was told that he had to have a physical address; accordingly, for lack of any alternative, he listed the petitioner's address. Additionally, both the petitioner and Mr. Hudson continued to list the same telephone number on official forms, although Mr. Hudson was not permitted to come into the petitioner's home to make or receive calls.[8] Finally, the evidence showed that, separated or not, the petitioner continued to drive Mr. Hudson to doctor's appointments, and that both listed the same address on medical and travel reimbursement forms.

---

[7]The petitioner testified that she maintained the status quo as to bills and the bank accounts for two reasons. First, she maintained hope that in the future Mr. Hudson would quit drinking and return home. Second, "[Mr. Hudson] and I have bad credit, and I really didn't think that we'd ever be able to establish another bank account[.]"

[8]The petitioner testified that if any call came to her home for Mr. Hudson, she took a message and saw to it that he received it.

-5-

Shortly after Mr. Hudson moved into the camper in late April, 2010, the petitioner applied for and began receiving SNAP benefits as a separated spouse in a one-person household. More than a year later, in June, 2011, while clearing NEMT[9] files, a DHHR worker noticed that the petitioner "was always taking [Mr. Hudson] to the doctor. The worker also noted that they had the same physical address." Thereafter, a repayment referral was made to the proper benefits unit, which determined that the petitioner and Mr. Hudson were both in the same "income group" and therefore "[b]oth of their incomes [should have been] considered when determining the SNAP or food stamp benefit amount." Since the petitioner's SNAP benefits had been determined on the basis of her income alone, DHHR determined that she had been overpaid a total of $1,985.00 over the course of seventeen months.

On September 8, 2011, DHHR sent the petitioner a notice of overpayment, giving the following reason for its action: "We have determined that you were issued more SNAP benefits than you were eligible to receive during the period 05/01/2010 to 09/30/2011 *because of other eligibility factors*." (Emphasis supplied.) After receiving this notice, the petitioner requested a hearing. Following three unsuccessful attempts by her representative

_____

[9]NEMT is the acronym for Non-Emergency Medical Transportation. Pursuant to § 19.3 of the *West Virginia Income Maintenance Manual*, "[r]ecipients of Medicaid . . . may request reimbursement for the cost of transportation associated with receiving medical services. Payments are made to the client or the transportation provider and can include meals, lodging, parking and turnpike tolls when required."

to obtain her file,[10] the petitioner went to the DHHR office and staged a mini "sit-in" for several hours until the file was finally provided to her.

At the hearing, DHHR presented the testimony of two witnesses (one in rebuttal) and introduced seventeen exhibits; the petitioner presented the testimony of five witnesses and introduced fifteen exhibits. Significantly, at the conclusion of the rebuttal witness' testimony, the Repayment Investigator conducting the hearing for DHHR appeared to concede that although DHHR had believed in good faith that the petitioner and Mr. Hudson "lived together in the same residence, the same dwelling, but separate parts of the building," the evidence had not borne that out.[11]

---

[10]DHHR regulations specify that upon notice of adverse action and a request for hearing, a recipient has a right of access to "his or her entire case file."

[11]The investigator explained that DHHR had been told by Lorintha Hiles, a caseworker, that Mr. Hudson "lived behind" the petitioner, from which DHHR inferred that the petitioner lived in the front rooms of her home and Mr. Hudson lived in the back rooms. However, in her testimony at the hearing, Ms. Hiles conclusively rebutted that inference:

> Q: At any point in time did Ms. Hudson or Mr. Hudson, either one, tell you that they lived in the same house when they were separated?
>
> A: They gave me the impression that they didn't live together because her income would have counted against his medical card.
>
> . . . .
>
> Q: Let me make sure. You're saying that you got the

(continued...)

-7-

Notwithstanding this concession, respondent Baisden affirmed DHHR's overpayment claim, concluding that the petitioner had not submitted sufficient evidence to support her claim that she and Mr. Hudson had separate residences because the two "shared utilities, they shared liquid assets, and they shared the property at 7856 Ridgeview Nellis Road." On petition for writ of certiorari, the Circuit Court of Kanawha County affirmed the DHHR's overpayment claim, finding on the basis of the evidence presented that it is "logical to conclude that Petitioner and her spouse lived in the same household."

Significantly, neither respondent Baisden nor the circuit court made any findings of fact or conclusions of law with respect to two threshold issues raised by the petitioner and argued by her throughout these proceedings: whether the DHHR's notice of overpayment was so inadequate as to deprive the petitioner of due process of law; and whether the DHHR's failure to promptly turn over the petitioner's file obstructed her due process right of access to it.

---

[11](...continued)
impression he lived in a camper separate, on a separate part of his property.

A: It would have had to be a separate dwelling for his medical card. Otherwise, her income would have counted against his medical card.

-8-

## II. STANDARD OF REVIEW

This Court has held that "[u]nder *W. Va. Code*, 29A-1-2 [1964], the Administrative Procedures Act does not apply to the Department of Welfare." Syl. Pt. 1, *State ex rel. Ginsberg v. Watt*, 168 W. Va. 503, 285 S.E.2d 367 (1981). Rather, "[a] writ of certiorari in the Circuit Court of Kanawha County is the proper means for obtaining judicial review of a decision made by a state agency not covered by the Administrative Procedures Act." Syl. Pt. 2, *Ginsberg*, 168 W. Va. at 503, 285 S.E.2d at 368.

In the circuit court proceedings, "'[t]he circuit court has a large discretion in awarding [a writ of certiorari] . . . and, unless such discretion is plainly abused, this Court cannot interfere there with.' Syllabus Point 1, in part, *Michaelson v. Cautley*, 45 W. Va. 533, 32 S.E. 170 (1898)." Syl. Pt. 1, *Wysong ex rel. Ramsey v. Walker*, 224 W. Va. 437, 686 S.E.2d 219 (2009). "'On certiorari the circuit court is required to make an independent review of both law and fact in order to render judgment as law and justice may require.' Syllabus Point 3, *Harrison v. Ginsberg*, 169 W. Va. 162, 286 S.E.2d 276 (1982)." Syl. Pt. 2, *Wysong*, 224 W. Va. at 438, 686 S.E.2d at 220. "'Unless otherwise provided by law, the standard of review by a circuit court in a writ of certiorari proceeding under W. Va. Code § 53-3-3 (1923) (Repl. Vol. 2000) is de novo.' Syllabus Point 2, *State ex rel. Prosecuting Attorney of Kanawha County v. Bayer Corp.*, 223 W. Va. 146, 672 S.E.2d 282 (2012)." Syl. Pt. 3, *Wysong*, 224 W. Va. at 438, 686 S.E.2d at 220.

"When, after judgment on certiorari in the circuit court, a writ of error is prosecuted in this court to that judgment, a decision of the circuit court on the evidence will not be set aside unless it clearly appears to have been wrong." Syl., in part, *Snodgrass v. Bd. of Educ. of Elizabeth Indep. Dist.*, 114 W. Va. 305, 171 S.E. 742 (1933). This Court will review the decision of the circuit court and the record "to determine whether the circuit made a 'clear error in judgment or exceed[ed] the bounds of permissible choices in the circumstances.'" *Wysong*, 224 W. Va. at 442, 686 S.E.2d at 224.

A claim of a violation of the due process clause of the United States Constitution, Amendments V & XIV, and the West Virginia Constitution, article III, section 10, presents mixed questions of law and fact. Consequently, the circuit court's factual findings relevant to the constitutional claim are reviewed under a clearly erroneous standard, and questions of law are subject to a de novo review. *Cf. State v. White*, 228 W. Va. 530, 546, 722 S.E.2d 566, 582 (2011) (standard of review governing alleged violations of *Brady v. Maryland*, 373 U.S. 83 (1963), is de novo); *Gainer v. Walker*, 226 W. Va. 434, 438-39, 701 S.E.2d 837, 841-42 (2009) (standard of review governing grievance rulings includes "[p]lenary review . . . as to the conclusions of law and application of law to the facts, which are reviewed *de novo*"); *State v. Matthew David S.*, 205 W. Va. 392, 395-96, 518 S.E.2d 396, 399-400 (1999) (standard of review governing search and seizure issues is *de novo*).

III.  DISCUSSION

A.

**The DHHR Notice**

Almost thirty years ago the United States Supreme Court determined that

> [f]ood stamp benefits, like the welfare benefits at issue in
> *Goldberg v. Kelly*, 397 U.S. 254 (1970), "are a matter of
> statutory entitlement for persons qualified to receive them." *Id.*,
> at 262 (footnote omitted).  Such entitlements are appropriately
> treated as a form of 'property' protected by the Due Process
> Clause; accordingly, the procedures that are employed in
> determining whether an individual may continue to participate
> in the statutory program must comply with the commands of the
> Constitution.  *Id.*, at 262-263.

*Atkins v. Parker*, 472 U.S. 115, 128 (internal footnote omitted).    Although the

*Goldberg*/*Atkins* property interest paradigm was supplanted by Congress with its passage of

the Personal Responsibility and Work Opportunity Reconciliation Act, 42 United States Code

§ 601 (1996),[12] at least as to recipients of cash assistance,[13] federal food stamp regulations

---

[12]In 42 United States Code § 601(b), Congress pronounced: "No individual
entitlement: This part shall not be interpreted to entitle any individual or family to assistance
under any State program funded under this part*." See State ex rel. K.M. v. W. Va. Dep't of
Health and Human Res.*, 212 W. Va. 783, 792, 575 S.E.2d 393, 402 (2003).  In *K.M.*, we
noted that '[w]hile reasonable minds may differ as to the wisdom of this approach, clearly
the Congress and the Legislature intended a clear break with the past practice of providing
cash assistance of unlimited duration to the poor."  (Internal footnote omitted.)

[13]The petitioner claims that because SNAP, 7 United States Code §§ 2011 to 2036a,
contains no provisions similar to the "no individual entitlement" language in 42 United States
Code § 601(b), the *Goldberg*/*Atkins* analysis still applies to food stamp recipients, who have
a property interest in retaining their benefits.  Inasmuch as this case may be decided on
statutory grounds, this Court need not address the constitutional issue.  *See Lee Trace, LLC*
(continued...)

-11-

governing SNAP benefits, 7 United States Code §§ 2011 to 2036a, still require adequate notice of an adverse action. Such notice is defined as one that "explains in easily understandable language: The proposed action; [and] the reason for the proposed action . . . ." 7 C.F.R. 273.13(a)(2). Consistent therewith, in West Virginia, DHHR's Manual specifies that "adequate notice . . . must include the following information: . . . 2. The reason(s) for the action provided in terms readily understandable by the applicant or recipient and specifying all applicable manual sections." *DHHR Common Chapters Manual*, Section 710.14.A.2.[14] Whether the adequacy of notice is framed as a constitutional issue or a statutory one, "[t]he underlying policy rationale is that recipients of public assistance benefits should be afforded a degree of protection from agency error and arbitrariness in the administration of those benefits." *Baker v. State, Dep't of Health and Soc. Serv.*, 191 P.3d 1005, 1009 (Alaska 2008) (citing *Banks v. Trainor*, 525 F.2d 837, 842 (7th Cir. 1975)).

---

[13](...continued)
*v. Raynes*, No. 12-0638, __W. Va. __, __, __ S.E.2d __, __ (W. Va. filed Oct. 21, 2013), (petitioner taxpayer alleged that notice from assessor was constitutionally inadequate, but this Court decided the issue on statutory grounds: "[The notice] does not comport with the requirements established in W. Va. Code § 11-3-2a, as it fails to adequately inform the person assessed or the person controlling the property of his or her 'right to appear' and seek an adjustment in the assessment."

[14]This and other regulations were developed in response to a Consent Decree entered in *Miller v. Ginsberg*, C/A No. 74-390 CH (S.D.W.Va. 1987), which required, *inter alia*, "adequate notice, simplified in form and comprehensible to the average person, which notice shall clearly state: (1) the proposed action; [and] (2) the reasons for the action being taken[.]"

In the instant case, the notice sent to the petitioner stated that ""[w]e have determined that you were issued more SNAP benefits than you were eligible to receive during the period 05/01/2010 to 09/30/2011 because of other eligibility factors." The petitioner contends that "because of other eligibility factors" fails the DHHR's own requirement that the notice contain "reason(s) for the action provided in terms readily understandable by the applicant or recipient." The DHHR, in its four-page Summary Response,[15] does not address this issue, dismissing it as "irrelevant" and stating baldly that the notice was "correct" because it informed the petitioner that she was being charged with an overpayment, that she had a right to a hearing, and that she could be represented at the hearing by anyone of her choice.

We agree with the petitioner that the notice was inadequate under the relevant DHHR Manual provision, and find that DHHR's argument to the contrary is frivolous.[16] However,

---

[15]Although DHHR's submission was designated as a "Summary Response," it did not comply in any respect to the requirements of Rule 10(e) of the West Virginia Rules of Appellate Procedure. We take this opportunity to note that in cases such as these, "[w]here the recipient has a 'brutal need' for the benefit at issue," *Baker*, 191 P.3d at 1010 (citing *Goldberg*, 397 U.S. at 261), this Court does not look kindly on a slapdash submission by DHHR which omits any discussion of the issues raised by the petitioner and contains no references to the record and no citations of either case law or statutory authority. We note also that Rule 10(j) provides for the imposition of sanctions where a party's brief does not comport with the rules, including "the Supreme Court refusing to consider the case, denying oral argument to the derelict party, dismissing the case from the docket, or imposing such other sanctions as the Court may deem appropriate."

[16]In *Baker*, 191 P.3d at 1010, the Supreme Court of Alaska cited numerous authorities standing for the proposition that an "agency must actively provide 'complete' notice and should not 'improperly place[] on the recipient the burden of *acquiring* notice[;] due process directs [the agency] to *supply* it.'" (Emphasis added and citations omitted.)

that is not the end of the inquiry. The issue is whether the remedy for DHHR's noncompliance with its regulation is dismissal of the overpayment claim in all circumstances – even where, as here, the petitioner concedes that her counsel was able to figure out the basis for the overpayment claim and vigorously defend it on the merits. The petitioner argues that unless the remedy is dismissal in all circumstances, a veritable "Catch-22" situation results: individuals with counsel will cure the defective notice, and individuals without counsel, not being schooled in the law, will never raise the issue. The result in either case is that DHHR will never "pay the piper" for its non-compliance with its own regulations, and thus will never have an impetus to ensure that it is providing adequate notice of adverse action. *See Vargas v. Trainor*, 508 F.2d 485, 490 (7th Cir. 1974), *cert. denied*, 420 U.S. 1008 (1975) (noting that because there is a "human tendency" to assume that governmental action is correct, "many of the mistakes that will inevitably be made will stand uncorrected[.]").

Although we are sympathetic with the petitioner's argument, we believe that dismissal in all circumstances is too draconian a remedy for this Court to impose on an agency tasked with maximizing scarce resources to serve tens of thousands of individuals in need of assistance. Accordingly, we hold that where the West Virginia Department of Health & Human Resources provides notice of an overpayment to an individual receiving food stamp benefits pursuant to the Supplemental Nutrition Assistance Program, 7 United States Code §§ 2011 to 2036(a) (2012), said notice must contain, at a minimum: (1) an explanation

of the proposed action and the reason therefor, in simplified form and easily understandable language; and (2) a reference to all applicable sections of the *DHHR Common Chapters Manual*. Where the notice does not comply with these requirements, the burden is on the Department to establish, by a preponderance of the evidence, that the food stamp recipient was not prejudiced thereby in his or her ability to contest the overpayment claim. Where the trier of fact concludes that the recipient was in fact prejudiced, the overpayment claim shall be dismissed. Where the trier of fact concludes that the recipient was not prejudiced, the overpayment claim may proceed to decision on the merits.

In the instant case, the petitioner concedes that she was not prejudiced by the inadequate notice. Therefore, although we find that DHHR's notice of overpayment was inadequate and in clear violation of its own regulations, we do not grant relief to the petitioner on this basis.

B.

**Failure to Promptly Turn Over the File**

As noted, the petitioner claims that during a two-week period after she received the overpayment notice, she and/or her counsel made four attempts to secure a copy of her file, the last attempt successful only because she refused to leave the DHHR's office until the file

-15-

was given to her.[17]   Although DHHR, in response, refers to the difficulties in balancing "the needs of a client who appears and requests to review an entire record . . . against the needs and interests of the multiple other clients also seeking the assistance of the local county office that day[,]" there is no evidence in the record to indicate that such a balancing test had anything to do with the difficulties experienced by the petitioner in receiving her file.[18]

Whether due to negligence, indifference or ineptitude, there is no question that the DHHR obstructed and impeded the petitioner's right of access to her file.  Four times she asked for it; four times she was told "no."  As was the case with the inadequate notice, however, the evidence indicates that the petitioner ultimately *did* receive her file and that her counsel *did* have adequate time to prepare and mount a vigorous defense to the overpayment claim.  Thus, again, the issue before this Court is the remedy.

Again, the petitioner contends that the remedy should be dismissal in all circumstances, and again, this Court concludes that such remedy is too draconian, especially in a case where there is no evidence to indicate that DHHR acted deliberately.  Accordingly,

[17]The petitioner's brief provides cites to testimony and evidence in support of this assertion.  The DHHR does not contest the facts, but argues (inferentially) that there was no bad faith or intent on its part to withhold the petitioner's file.

[18]According to the evidence presented, the petitioner and/or her counsel requested the file several times by mail.  On the day when the petitioner staged her "sit-in" at the county office, she was not told that workers were busy with other clients; rather, she was flatly told that she could not have the file.

-16-

we hold that where the West Virginia Department of Health & Human Resources provides notice of an overpayment to an individual receiving food stamp benefits pursuant to the Supplemental Nutrition Assistance Program, 7 United States Code §§ 2011 to 2036(a) (2012), and the food stamp recipient requests a hearing, the recipient has a right of access to his or her entire case file. Where the Department unreasonably obstructs or impedes a recipient's right of access to the file, the burden is on the Department to establish, by a preponderance of the evidence, that the food stamp recipient was not prejudiced thereby in his or her ability to contest the overpayment claim. Where the trier of fact concludes that the recipient was in fact prejudiced, the overpayment claim shall be dismissed. Where the trier of fact concludes that the recipient was not prejudiced, the overpayment claim may proceed to decision on the merits.

In the instant case, the petitioner concedes that she was not prejudiced by the difficulty she encountered in securing access to her file. Therefore, although we find that the DHHR obstructed or impeded her right of access, in clear violation of its own regulations, we do not grant relief to the petitioner on this basis.

C.

**Whether Petitioner and Mr. Hudson "Lived Together"
During the Relevant Time Period**

Under federal law, food stamp benefits may be provided to a "household," generally defined as an individual or group of individuals "who live together and customarily purchase food and prepare meals together for home consumption." 7 U.S.C. § 2012(n)(1) (2012); 7 C.F.R. § 273.1(a).[19] This is a two-part test for unmarried individuals; even if they live together, so long as they do not purchase food and prepare meals together they may qualify for benefits individually. However, spouses who live together must be considered as one household even if they do not customarily purchase and prepare meals together. 7 U.S.C. § 2012(n)(2); 7 C.F.R. 273.1(b)(1); WV Income Maintenance Manual § 9.1.A.1.b.(2).[20]

Neither the statute, the regulation nor the DHHR manual defines the term "living together." The Secretary of the Department of Agriculture "has chosen not to define the term but to determine which individuals are living together through 'the application of a

---

[19]The limitations contained within this definition were "designed to further limit the number of instances in which household members may manipulate current rules and gain status as separate food stamp households (and receive, thereby, larger benefits), although they live together and depend on one another for support." S.Rep. No. 97-504, 97th Cong., 2nd Sess. 24-25 (1982), *reprinted in* 1982 U.S. Code Cong. & Admin. News 1641, 1661.

[20]The United States Supreme Court has upheld the right of Congress to "'[l]imi[t] the availability of the "purchase and prepare food separately" rule to those most likely to actually be separate households, although living together with others for reasons of economy or health (i.e., [distant relatives and] unrelated persons).' S. Rep. No. 97-504, p. 25 (1982)." *Lyng v. Castillo*, 477 U.S. 635, 641-42 (1986).

reasonable judgment based on the circumstances of a particular living arrangement.' 47 Fed.

Reg. 52,328, 52,329 (1982)." *Robinson v. Block*, 869 F.2d 202, 213 (3rd Cir. 1989). This

reasonable judgment test allows for consideration of a wide range of factors, but specifically

prohibits application of an irrebuttable "same address" presumption. *Robinson*, 869 F.2d at

213-14 (evidence that siblings lived at same address may be considered but is not

conclusive); [21] *Zayas v. Dep't. of Health & Rehabilitative Serv.*, 598 So.2d 257, 259 (Fla.

Dist. Ct. App. 1992) ("Congress did not intend that households be subject to a 'same address'

test in determining whether individuals 'live together[,]'" (citing *Robinson*, 869 F.2d at

214)).

Thus, we examine the record, pursuant to the appropriate standard of review, to

determine de novo whether the circuit court applied the correct test; and thereafter to

determine whether the court's findings of fact were clearly erroneous.

---

[21]Pursuant to federal food stamp laws in effect at the time *Robinson* was decided, siblings living together, regardless of age, were treated as comprising one household even if they did not customarily purchase and prepare meals together. Under the Supplemental Nutrition Assistance Program, there are now three types of individuals who are treated as comprising one household even if they do not customarily purchase and prepare meals together: spouses *who live together*; parents and minor children who live together; and children under the age of eighteen living with a non-parent who functions as a parent. 7 U.S.C. § 2012(n)(2).

1.

**The Test Applied by the Circuit Court**

As set forth herein, *see* text *supra*, the issue before the circuit court on certiorari, and now before this Court on appeal, is whether the petitioner and Mr. Hudson *lived together*, which in turn is dispositive of whether they constituted a "household" within the applicable statutes and regulations. The circuit court's order contains no discussion of, no reference to, and no finding on, this issue. Rather, the court concluded that the "Petitioner and her spouse shared utilities and property where Petitioner receives her public assistance benefits; therefore, it is logical to conclude that Petitioner and her spouse lived in the same household during the repayment period of May 2010 to September 2011."

In *Baca v. Arizona Department of Economic Security*, 951 P.2d 1235, 1238 (Ariz. Ct. App. 1998), a case quite similar to the case at bar, the Arizona Department of Economic Security, which administered that state's food stamp program, conceded that whether spouses lived together, not whether they were members of a household, is the relevant test. "DES admits in its brief that the Board's statement that 'living together' is not necessary for determination of inclusion in a household for food stamp eligibility purposes seems contrary to federal law. We agree." *Id.*; *see also Robinson*, 869 F.2d at 209 (Secretary of Agriculture stipulated that defendant agencies "are required . . . to refrain from alleging overissuances of food stamps to siblings who can show that they do not or did not 'live together'").

Here, because the circuit court concluded that the petitioner and her husband constituted a "household" in the absence of a finding that they lived together, the court utilized the wrong test in denying the petitioner's petition for a writ of certiorari. A "household," under the relevant portion of the express language of 7 United States Code § 2012(n)(2), consists of "[s]pouses who live together."

Ordinarily, having concluded that the circuit court utilized the wrong test in evaluating the evidence of record, this Court would remand for the court to re-evaluate the evidence under the correct test. However, because the evidence in this case admits of only one conclusion, in the interest of judicial economy we proceed to decision on the merits.[22]

## 2.

**The Circuit Court's Findings of Fact**

In order to evaluate the circuit court's findings of fact, we examine the evidence presented to respondent Baisden. As set forth in this opinion, *see* text *supra*, the inquiry is

---

[22]*Compare Gentry v. Mangum*, 195 W. Va. 512, 466 S.E.2d 171 (1995) (holding that trial court erred in excluding expert testimony under Rules 702 and 703 of the West Virginia Rules of Evidence, and remanding for reconsideration of the testimony under Rule 403); *with Leary v. McDowell Co. Nat. Bank*, 210 W. Va. 44, 552 S.E.2d 420 (2001) (holding that trial court erred in granting summary judgment for employer in employees' claim for wages and fringe benefits, and remanding with directions that court enter summary judgment for Commissioner of the Division of Labor); *and Spitznogle v. Durbin*, 230 W. Va. 398, 738 S.E.2d 562 (2013) (holding that trial court erred in granting summary judgment for sellers, and remanding with directions that court enter summary judgment for purchasers).

whether the petitioner and Mr. Hudson lived together during the seventeen month period encompassed by the overpayment claim. Courts that have considered this issue have uniformly held, in accordance with *Robinson*, 869 F.2d at 213-14, that the fact that individuals have the same address is not by itself sufficient to establish that they live together. Rather, the agency must consider all of the relevant circumstances of a particular living arrangement, such as "separate entrances and locks, separate finances, utility bills and telephone, and essentially separate living quarters." *Id*. at 209.[23] We agree, and accordingly, we hold that determination of whether individuals "live together" within the meaning of the Supplemental Nutritional Assistance Program, 7 United States Code § 2012(n)(2) (2012), requires the application of reasonable judgment based on all relevant circumstances of a particular living arrangement. Evidence that individuals use the same mailing address may be considered, but is not, in and of itself, conclusive of the issue.[24]

With this standard in mind, we turn to the relevant circumstances presented in the instant case. The petitioner and her witnesses testified, without contradiction, that after the

---

[23]Obviously, many of the particular circumstances set forth in *Robinson* would apply only where individuals live in the same home but still claim that they do not "live together" within the meaning of 7 United States Code § 2012(n)(2).

[24]We emphasize that this case involves two individuals who, although married, did not live under the same roof. Therefore, our holding today establishes the application of the "same address" test only in this narrow context; we need not determine the outer limits of the "same address" test in a situation where individuals live in the same home, although in separate quarters within that home. *See* note 23 *supra*.

-22-

petitioner threw Mr. Hudson out of her home, he never set foot in the home again; that Mr. Hudson kept no clothing, toiletries or other personal items in the home; that for the first four months, Mr. Hudson lived in a camper, belonging to his brother, that was located on the petitioner's property, and ran an extension cord from the petitioner's home to the camper; that the petitioner and Mr. Hudson shared no other utilities; that for the next three months, Mr. Hudson lived in his mother's home; and that after the death of Mr. Hudson's mother, his brother removed the camper and for the next ten months Mr. Hudson lived variously with his son, his daughter, his stepdaughter or his sister.

The relevant evidence[25] presented by DHHR was that Mr. Hudson shared electricity with the petitioner for the first four months of the seventeen month overpayment period; that Mr. Hudson listed the petitioner's address as his own when applying for medical benefits and renewing his driver's license; that Mr. Hudson listed the petitioner's telephone number as his own in those same documents; and that the couple did not establish separate bank accounts after their separation. With regard to the first item of evidence, the petitioner and Mr. Hudson testified without contradiction that he provided at least some reimbursement to the

---

[25]DHHR's evidence that the petitioner drove Mr. Hudson to medical appointments is irrelevant to a determination of whether the two lived together, as is Mr. Hudson's statement that "he took care of her and she took care of him." At best, this evidence demonstrates that the couple maintained a loving bond and continued to assist each other whenever possible, despite their separation; as the petitioner testified, "[a]ny time he straightens himself up, that's his home."

petitioner for her electric bill. With regard to the second, Mr. Hudson testified without contradiction that government agencies will not accept a post office box as an "address," and he therefore listed the petitioner's address for lack of anything else to list. With regard to the third, the petitioner testified without contradiction that when any calls came in for Mr. Hudson, she took a message and delivered it either to Mr. Hudson or his daughter. With regard to the fourth, the petitioner testified without contradiction that because both she and Mr. Hudson had "bad credit," she believed that neither would be able to open a new banking account.[26]

This Court has carefully examined the record, and concludes that no reasonable factfinder could find, on the basis of the evidence presented, that the petitioner and Mr. Hudson lived together from May, 2010, through September, 2011. Both the hearing examiner and the circuit court put great reliance on the fact that Mr. Hudson lived in a camper located on the petitioner's property, and utilized the petitioner's electricity.[27] However, neither the hearing examiner nor the court addressed the fact that the camper was owned by Mr. Hudson's brother, not by the petitioner; that Mr. Hudson reimbursed the

---

[26]Although counsel for DHHR implied at oral argument that the testimony of the petitioner and her witnesses was not credible, neither the hearing officer nor the circuit court made any such credibility findings.

[27]Both respondent Baisden and the circuit court used the collective term "utilities" in their respective opinions, whereas the undisputed testimony was that the petitioner and Mr. Hudson shared only electricity, and only for a short time.

petitioner for the electricity, at least in part; and that Mr. Hudson lived in the camper for only *four months*, whereas the overpayment period alleged by DHHR spans *seventeen months*. Further, neither the examiner nor the court addressed the fact – which was undisputed – that from the day in April, 2009 or 2010, that the petitioner threw Mr. Hudson out of her home, he never set foot in it again.

The hearing examiner's conclusion that the petitioner and Mr. Hudson shared "liquid assets" is not supported by any evidence of record, even assuming, arguendo, that it had any bearing on whether the Hudsons were living together. Although the petitioner and Mr. Hudson did not establish separate bank accounts, for reasons explained by the petitioner, there was no evidence presented that they shared their respective assistance checks or other income with each other.

Finally, the fact that Mr. Hudson continued to list the petitioner's address and telephone number as his own, on his DMV application and his application for medical benefits, establishes nothing under the facts and circumstances of this case. The undisputed evidence was that Mr. Hudson had no access to the petitioner's home, even during the four months he lived in the camper, and no access to the telephone. Only by applying an irrebutable "same address" presumption – which both the hearing examiner and the circuit

court appear to have done – could this evidence be deemed sufficient to establish that the petitioner and Mr. Hudson lived together. *Robinson*, 869 F.2d at 213-14.

In *Baca*, *supra*, the petitioner, Ms. Baca, appealed from a decision of the state's Department of Economic Security Appeals Board finding that her husband was a member of her household whose resources would be included for determining her food stamp eligibility. The Board's decision was based upon findings that Mr. Baca was a joint owner of the petitioner's house; that he came to the house every day to see the couple's children and stayed until 2:00 a.m.; that he spent most Friday nights and some Saturday nights in the home; that he kept clothes in the home; that he picked up his mail at the home; and that Ms. Baca had informed Mr. Baca's employer that the couple lived together so that the employer would cease withholding child support payments from his check. 951 P.2d at 1239. Additionally, Mr. Baca used his wife's address as his own in employment records, DMV records, mortgage records, and at least two vehicle liens. In contradiction to this evidence, Ms. Baca submitted "short, handwritten statements . . . in which various parties stated without elaboration that she and [her husband] were not living together[,]" which the court concluded "were not entitled to much probative weight." *Id.* at 1239 n.4.

Not surprisingly, under the "reasonable judgment based on all relevant circumstances" test, the *Baca* court concluded on these facts that Mr. and Mrs. Baca lived together. Here,

in contrast, the DHHR's case hangs – quite literally – on an extension cord run from the petitioner's house to Mr. Hudson's camper during a four month period of time. None of the other evidence submitted by DHHR in any way establishes that the petitioner and Mr. Hudson lived together from May, 2010, through September, 2011; at best, it established that Mr. Hudson used the petitioner's address, for lack of any alternative, when he was required to list an address on official documents.[28]

Pursuant to the DHHR's regulations, "[t]he burden of proof is first on the Department to prove, by a preponderance of evidence, that its adverse action was correct, then shifts to the applicant or recipient to prove, again by a preponderance of evidence, that the Department's action was incorrect." *DHHR Common Chapters Manual* § 710.20.F. This Court finds that DHHR failed to prove that the petitioner and Mr. Hudson lived together during the seventeen month time period of the overpayment claim, and that the claim should have been dismissed at the conclusion of DHHR's evidence. Even assuming, arguendo, that the DHHR's evidence was sufficient to shift the burden of proof to the petitioner, the petitioner's evidence was overwhelming and established that DHHR's action was incorrect. Accordingly, we find that in denying the petitioner's petition for a writ of certiorari, the

---

[28]We note that DHHR never sought to amend its overpayment claim to encompass only that period of time during which Mr. Hudson was living in the camper, choosing instead to try the case and defend it on appeal as an "all or nothing" case.

-27-

circuit court "made a 'clear error in judgment [and] exceed[ed] the bounds of permissible choices in the circumstances." *Wysong*, 224 W. Va. at 442, 686 S.E.2d at 224.

## IV.

## CONCLUSION

The judgment of the Circuit Court of Kanawha County is reversed, and this case is remanded with instructions that the court grant the petitioner's petition for a writ of certiorari and dismiss the DHHR's overpayment claim.

Reversed and Remanded
With Instructions.